IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE CHICAGO FAUCET SHOPPE, INC., on behalf of itself and all others similarly situated, | : : : : | Civil Action No. (Cook County Case No. 12 CH 34208) |
| Plaintiff, | : : | |
| v. | : : | |
| NESTLÉ WATERS NORTH AMERICA INC., | : : : | |
| Defendant. | : : : | |

## NOTICE OF REMOVAL OF A CIVIL ACTION

PLEASE TAKE NOTICE that defendant Nestlé Waters North America Inc.

("NWNA") hereby removes this action, pursuant to the provisions of 28 U.S.C. §§ 1441,

1446 and 1453, from the Circuit Court of Cook County, Illinois, County Department,

Chancery Division (Case No. 2012 CH-34208) to the United States District Court for the

Northern District of Illinois, and respectfully states the following grounds for removal:

1.      On or about September 10, 2012, plaintiff The Chicago Faucet Shoppe, Inc.

("Plaintiff"), on its own behalf and allegedly on behalf of others similarly situated,

commenced this action in the Circuit Court of Cook County, Illinois, County Department,

Chancery Division, by filing a complaint styled Chicago Faucet Shoppe, Inc., et al. v.

Nestlé Waters North America Inc., No. 12 CH 34208 (the "Complaint"). Plaintiff named NWNA as the sole defendant in the Complaint.

2.     On September 11, 2012, copies of the Summons and Complaint were served upon NWNA.

3.     The Circuit Court for Cook County, Illinois is located within the Northern District of Illinois.

4.     This Notice of Removal is timely filed with this Court pursuant to 28 U.S.C. § 1446(b), as it is being filed within 30 days of NWNA's receipt of the Complaint.

5.     Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served upon NWNA to date are attached hereto as Exhibit A.

## Diversity Jurisdiction Pursuant to CAFA

6.     This Court has original jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), as this civil action is a "class action" and the amount in controversy exceeds the sum of $5 million dollars, exclusive of interest and costs.

## Citizenship

7.     Plaintiff brings this action on its own behalf, and pursuant to 735 ILCS 5/2-801, allegedly on behalf of all persons in Illinois, Michigan, Minnesota and Missouri who purchased Ice Mountain® brand 5-gallon bottled water, as a result of NWNA's alleged unfair and deceptive trade practices in violation of the Illinois Consumer Fraud and

US_ACTIVE-110794280.1

Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* ("ICFA"). (*See* Compl. ¶¶ 2, 41, 42, 50).

8.    This action is a "class action" under CAFA, as it is a "civil action filed under . . . [a] State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B).

9.    Plaintiff is a citizen of Illinois. (Compl. ¶ 3.)

10.    NWNA is a corporation organized under the laws of the State of Delaware and has its principal place of business in Stamford, Connecticut. (*See* Compl. ¶ 4.)

11.    Members of the putative class are citizens of a State different from NWNA. (*See* Compl., ¶¶ 2, 41, 43.)

12.    28 U.S.C. § 1332(d)(2) applies to this action, as the Complaint alleges that the number of members of the proposed class exceeds one hundred. (*See* Compl., ¶ 43).

13.    Accordingly, diversity of citizenship exists pursuant to CAFA between members of the putative class of Illinois, Michigan, Minnesota and Missouri citizens, on the one hand, and defendant NWNA, on the other hand. *See* 28 U.S.C. § 1332(d)(2)(A).

## Amount in Controversy

14.    Under CAFA, the amount-in-controversy required for a "class action" is $5,000,000, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2). Moreover, in calculating the amount-in-controversy "the claims of the individual class members shall be aggregated." *Id.* § 1332(d)(6).

15.    Plaintiff alleges that NWNA engaged in uniform and deceptive conduct, including deceptive advertising, about a product, Ice Mountain® brand 5-gallon bottled

US_ACTIVE-110794280.1

water. Plaintiff seeks, on behalf of itself and the putative class, money damages, punitive damages, and its attorneys' fees and costs, pursuant to the Illinois CFA. (*See* Compl. ¶¶ 49-65.) Additionally, Plaintiff seeks, on behalf of itself and the putative class, disgorgement of "all monies" NWNA received from the sales of Ice Mountain® brand 5-gallon bottled water. (*See id.* ¶¶ 66-72.)

16. According to NWNA's records, since October 2009, more than $5,000,000 of Ice Mountain® brand 5-gallon bottled water has been sold in Illinois alone. (*See* Declaration of Eric Lord, attached hereto as Exhibit B). Consequently, the total aggregated amount of the putative class members' claims for actual damages, punitive damages, and attorneys fees exceeds $5,000,000. CAFA's amount-in-controversy requirement is thus satisfied. *See* 28 U.S.C. § 1332(d)(2).

17. Because diversity of citizenship exists between at least one member of the putative class and the defendant NWNA, and the amount-in-controversy exceeds $5,000,000, this Court has original jurisdiction over this action pursuant to CAFA. *See* 28 U.S.C. § 1332(d)(2).

18. Pursuant to 28 U.S.C. § 1446(d), copies of this Notice of Removal were served upon Plaintiff's counsel and filed with the appropriate state court clerk on this day.

US_ACTIVE-110794280.1

WHEREFORE, Defendant Nestlé Waters North America Inc. respectfully removes this action from the Circuit Court for Cook County, Illinois.

October 10, 2012

Respectfully submitted,

NESTLÉ WATERS NORTH AMERICA INC.
*Defendant*

/s/ *Sarah R. Wolff*
By: One of its Attorneys

Jeffrey M. Garrod (*pro hac vice* application to be filed)
ORLOFF, LOWENBACH, STIFELMAN & SIEGEL, P.A.
101 Eisenhower Parkway - 4th Floor
Roseland, New Jersey 07068-1097

Sarah R. Wolff (ARDC No.: 3123733)
David Z. Smith (ARDC No. 6256687)
REED SMITH LLP
10 South Wacker Drive
Chicago, IL 60606-7507
Telephone:   (312) 207-1000
Facsimile:    (312) 207-6400

US_ACTIVE-110794280.1

US_ACTIVE-110794280.1

# EXHIBIT A

| 2120 - Served ♀ | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| SUMMONS | ALIAS - SUMMONS |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, ~~LAW~~ *Chancery*

No. _____

Nestle Waters North America, Inc.

THE CHICAGO FAUCET SHOPPE, INC.

(Name all parties)

v.

C/O CT Corporation System, R.A.

208 S. LaSalle Street, Suite 814, Chicago, IL 60604

NESTLE WATERS NORTH AMERICA, INC.

◉ SUMMONS ◯ ALIAS SUMMONS

**To each Defendant:**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

◉ Richard J. Daley Center, 50 W. Washington, Room 802 _____, Chicago, Illinois 60602

◯ District 2 - Skokie
5600 Old Orchard Rd.
Skokie, IL 60077

◯ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

◯ District 4 - Maywood
1500 Maybrook Ave.
Maywood, IL 60153

◯ District 5 - Bridgeview
10220 S. 76th Ave.
Bridgeview, IL 60455

◯ District 6 - Markham
16501 S. Kedzie Pkwy.
Markham, IL 60428

◯ Child Support
28 North Clark St., Room 200
Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF
REQUESTED IN THE COMPLAINT.

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

| | |
|---|---|
| Atty. No.: 18966 | WITNESS, _____, 2012 |
| Name: Michael J. Newman | *DOROTHY BROWN* SEP 1 0 2012 |
| Atty. for: Plaintiff | |
| Address: 5225 Old Orchard Road, Suite 5 | Clerk of Court |
| City/State/Zip: Skokie, IL 60077 | Date of service: _____, 2012 |
| Telephone: 847-673-4003 | (To be inserted by officer on copy left with defendant or other person) |

Service by Facsimile Transmission will be accepted at: _____

(Area Code) (Facsimile Telephone Number)

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

.

IN THE CIRCUIT, COURT OF COOK COUNTY ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| THE CHICAGO FAUCET SHOPPE, INC., on behalf of itself and all others similarly situated, | ) ) ) ) | Case No. |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| NESTLE WATERS NORTH AMERICA, INC. | ) ) ) | |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff, The Chicago Faucet Shoppe, Inc., by counsel, on behalf of itself and all others similarly situated, alleges as follows:

### NATURE OF THIS ACTION

1.      Nestle Waters North America Inc. represented to consumers that its Ice Mountain® bottled water is "100% Natural Spring Water . . . sourced only from carefully selected springs, and contains naturally occurring minerals for a crisp, clean taste." But, while making these representations, Nestle Waters omitted a critical disclosure—that the Ice Mountain® 5-gallon bottles are *not* 100% natural spring water, but are actually resold water sourced from municipal water systems.

2.      This is a class action on behalf of The Chicago Faucet Shoppe and numerous Illinois, Michigan, Minnesota, and Missouri residents who purchased Ice Mountain® 5-gallon bottles from Nestle Waters who omitted the disclose that those 5-gallon bottles are *not* 100% natural spring water.

## THE PARTIES

3.     The Plaintiff, The Chicago Faucet Shoppe, Inc. ("The Chicago Faucet Shoppe"), is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois.

4.     The Defendant, Nestle Waters North America, Inc. ("Nestle Waters"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Stamford, Connecticut.

5.     Nestle Waters is engaged in the business of locating and managing sources of water; extracting and obtaining water for bottled water products; bottling water; developing packaging and marketing of bottled water; selling and distributing of bottled water products to consumers; and delivering bottled water products to consumers.

6.     The Ice Mountain® Brand joined the Nestle Waters business portfolio in 1989.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this class action under 735 ILCS 5/2-801.

8.     This Court also has personal jurisdiction over Nestle Waters under 735 ILCS 5/2-209 because it is authorized to do business and in fact, does business in this state, and Nestle has sufficient minimum contacts with this state and otherwise purposefully avails itself of the privilege of doing business in this state  through the promotion, marketing, and sale of its products in this state, such that the exercise of jurisdiction by this Court is permissible under traditional notions of fair play and substantial justice.

9.     Venue is proper in this Court under 735 ILCS 2/101 because Nestle Waters is a nonresident of the State of Illinois.

2

FACTUAL ALLEGATIONS

*The Bottled Water Industry*

10.     The International Bottled Water Association defines bottled water as water sealed in a sanitary container to be sold for human consumption. Bottled water can be artificially purified, sourced from a natural source (spring or aquifer), flavored, or carbonated.

11.     Bottled water is usually perceived to be the same as tap water (and often is actually bottled tap water), thus bottled water manufacturers and distributors, like Nestle Waters, differentiate their bottled water by sourcing the water from sources other than local municipal water supplies, such as a spring or aquifer.

12.     Consumers will pay more for bottled water sourced from a unique source, like a spring, than they will pay for bottled water sourced from local municipal supplies.

13.     Recently bottled water sales have experienced little sales growth while sales of bottled water from spring sources have grown substantially.

14.     Because water sourced from a spring allows a higher price to be charged and results in increased sales, bottled water manufacturers and distributors, like Nestle Waters, prominently advertise that their bottled water is from a source other than local municipal water supplies, such as a spring.

15.     In turn, bottled water manufacturers and distributors, like Nestle Waters, do not prominently advertise (and even omit to disclose) when their bottled water is sourced from local municipal water supplies.

16.     This scheme works—the Natural Resources Defense Council estimates that, in comparison to the price of municipal tap water, consumers spend up to 10,000 times more per gallon for bottled water. (http://www.nrdc.org/water/drinking/nbw.asp.)

3

*Nestle Waters' Billion Dollar Bottled Water Business*

17.     Nestle Waters is the largest bottled water company in the United States. Nestle Waters represented 36.4% of the bottled water market in 2010 with sales of $4.11 billion. Nestle Waters is a business unit of Nestle S.A., with sales revenue of $8.7 billion. The Nestle Waters business represents 10% of Nestle S.A. global sales and holds the number one leadership position for bottled water brands in the world.

18.     Nestle Waters sells various brands of bottled water to consumers across the United States.

19.     Ice Mountain® bottled water is sold to consumers located in Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, and Wisconsin.

20.     Ice Mountain® bottled water is sold to consumers in single-serving sizes (for example, 8 ounce bottles) and in multiple-serving sizes (for example, 5-gallon jugs).

21.     Ice Mountain® single-serving size bottled water can be purchased at a variety of places, including supermarkets, gas stations, and drug stores.

22.     Ice Mountain® 5-gallon bottles can only be purchased by phone or on www.icemountainwater.com. The 5-gallon bottles are then delivered to the consumers' home or work place.

*Nestle Waters Touts the Benefits of Bottled Spring Water over Bottled Municipal Tap Water*

23.     Because bottled spring water can be sold for more than bottled municipal tap water and because sales of bottled spring water are growing, Nestle Waters' website and the www.icemountainwater.com website repeatedly tout the benefits of bottled spring water.

4

24.     Likewise, on its website http://www.myspringwater.com/GetQualityWater/
RegionalMap.aspx Nestle Waters states, "Tracing its sources back thousands of years to glaciers
that covered much of the Northern U.S. and Canada. Ice Mountain® Brand Natural Spring Water
emerges as springs found in certain Midwest and Mid-Atlantic state locations. In all cases, the
quality, taste and mineral composition are the result of the unique natural properties of the area.
(Ex. A.)

25.     And on http://www.icemountainwater.com/#/assured/history_and_heritage, Nestle
Waters states, "The history of Ice Mountain® Brand 100% Natural Spring Water can be traced
back thousands of years to the last ice age. As glaciers covered much of the northern United
States and Canada retreated, the natural elements they scraped up and left behind formed
mineral-rich deposits, some of which were hundreds of feet thick." And it goes on to explain,
"Along the edge of the glaciers, melting water formed streams and rivers. The sand and gravel
deposits left behind created aquifers, where large volumes of very pure ground water are present.
In some places, this ground water rises up to the surface and creates a natural spring. Today, a
few select springs have been chosen as sources for our crisp, fresh tasting Ice Mountain® Brand
100% Natural Spring Water. (Ex. B.)

26.     Nestle Waters admits that spring water has a unique taste: "Each spring has a
unique 'taste fingerprint' defined by its natural mineral composition." (Ex. C.)

*Nestle Waters' Scheme to Deceive Consumers*

27.     Because 5-gallon bottled water doesn't offer the convenience and portability of
single-serving bottled water, and because the 5-gallon bottles are delivered to a place (home or
office) where tap water is available for consumption, and because consumers can purchase

5

increasingly popular filtration devices to filter their own tap water, consumers purchase 5-gallon bottled water to obtain water from a special source like a spring.

28. Nestle Waters only sells its 5-gallon jugs by phone and on its website, www.icemountainwater.com, therefore the only information available to consumers is Nestle Waters' websites, and consumers can't view the actual product before purchasing it:





6

(*See* http://www.icemountainwater.com/#/home.)

29.     Nestle Waters' own website repeatedly promises that spring water can be

delivered to your home and office in 5-gallon bottles:

> Like your own spring, only steps away[.] Imagine having fresh, great-tasting
> spring water right in your home or office any time you want it. . . . Every 3-4
> weeks you'll have pure, refreshing spring water in 5-gallon bottles or cases
> delivered right to your door. . . .

(Ex. D.)

30.     Nestle Waters' website also contains a picture of a 5-gallon jug with the

promise of "Convenient Home Delivery" and "100% Natural Spring Water":



(*See* http://www.waterdeliveryoffers.com/index.cfm.)

31.     These websites fail to disclose to the consumer that Ice Mountain® 5-gallon jugs

actually contain resold municipal tap water and not "100% Natural Spring Water."

32.     The Ice Mountain® 5-gallon bottles would have cost less or would have been less

marketable if there had been a disclosure that the 5-gallon bottles do not contain 100% natural

spring water but instead contain resold municipal tap water.

33.    Nestle Waters' failure to disclose this critical fact caused consumers to purchase 5-gallon jugs that they wouldn't have otherwise purchased if that fact was known and caused consumers to pay more for 5-gallon bottled water.

*The Chicago Faucet Shoppe's Purchases of 5-Gallon Jugs from Nestle Waters*

34.    In 2008 The Chicago Faucet Shoppe began purchasing Ice Mountain® 5-gallon bottled water for monthly delivery to its Chicago, Illinois office.

35.    An officer of the The Chicago Faucet Shoppe made the purchases of the Ice Mountain® 5-gallon bottled water by telephone after viewing the website www.icemountainwater.com.

36.    At all times The Chicago Faucet Shoppe believed that it was purchasing 5-gallon bottles that contained 100% Natural Spring Water from Nestle Waters.

37.    The Chicago Faucet Shoppe received monthly billing invoices for the 5-gallon bottles that stated "Ice Mountain® Natural Spring Water" and the 5-gallon bottled water was delivered in a truck that contained the Ice Mountain® Natural Spring Water logo.

38.    The Chicago Faucet Shoppe discovered that the 5-gallon bottled water wasn't 100% natural spring water when an officer of the business called Nestle Waters in July 2012 to order Ice Mountain® 5-gallon bottled water for delivery to her home. After speaking to several Nestle Waters' employees, this officer was informed for the first time that the Ice Mountain® 5-gallon bottles do not contain 100% natural spring water but instead contain resold municipal tap water.

39.    The Chicago Faucet Shoppe has stopped purchasing 5-gallon bottled water from Nestle Waters because those bottles contain resold municipal tap water and not 100% natural spring water.

8

40. The Chicago Faucet Shoppe would not have purchased the 5-gallon bottles or paid the purchase price of the 5-gallon bottles that it did, had it known that those bottles contained resold municipal tap water and not 100% natural spring water.

## CLASS ACTION ALLEGATIONS

41. The Chicago Faucet Shoppe brings this action on its own behalf and as a class action on behalf of the following class:

> All persons in Illinois, Michigan, Minnesota, and Missouri who purchased Ice Mountain® Brand 5-gallon bottled water.

42. This action is properly maintainable as a class action under 735 ILCS 5/2-801.

43. The class consists of hundreds or more persons throughout the states of Illinois, Michigan, Minnesota, and Missouri, such that joinder of all class members is impracticable.

44. The Chicago Faucet Shoppe's claims are typical of those of other class members, all of whom have suffered harm due to Nestle Waters' course of conduct.

45. There are common questions of law and fact that predominate over any questions affecting only individual members of the class. These questions include but are not limited to the following:

a. Whether Nestle Waters engaged in a pattern or practice of selling Ice Mountain® 5-gallon bottled water without disclosing prior to the sale that those jugs did not contain 100% natural spring water;

b. Whether Nestle Waters concealed the material fact that it was selling Ice Mountain® 5-gallon bottled water without disclosing prior to the sale that those jugs did not contain 100% natural spring water;

c. Whether, in order to increase sales and prices on Ice Mountain® 5-gallon bottled water, Nestle Waters intentionally omitted that the Ice Mountain® 5-gallon bottled water was not 100% natural spring water;

9

   d.  Whether Nestle Waters engaged in consumer fraud and unfair or deceptive trade practices under the Illinois Consumer Fraud Act and the substantially similar consumer protection statutes of Michigan, Minnesota, and Missouri;

   e.  Whether Nestle Waters was unjustly enriched because it was able to sell Ice Mountain® 5-gallon bottled water at a higher price than consumers would have paid but for the omission.

46.   The Chicago Faucet Shoppe will fairly and adequately protect the interest of the class and has retained competent legal counsel experienced in class actions and complex litigation.

47.   The class action is an appropriate method for the fair and efficient adjudication of the controversy because the pursuit of hundreds or more individual lawsuits would not be economically feasible for individual class members and would cause a strain on judicial resources, yet each class member would be required to prove an identical set of facts in order to recover damages.

48.   This action does not present any unique management difficulties.

### Count I—Unfair and Deceptive Trade Practices

49.   The Chicago Faucet Shoppe incorporates each preceding paragraph of this Complaint as if fully set forth below.

50.   Nestle Waters has violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.* and those other state consumer protection statutes that are in all material respects similar to it within the geographic area in the class definition ("Consumer Protection Laws").

51.   Section 2 of the ICFA, 815 ILCS 505/2, provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense,

10

false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practices described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

52.     Section 10a of the ICFA, 815 ILCS 505/10A, provides in relevant part:

(a)     Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . .
* * *

(c)     Except as provided in subsections (f), (g), and (h) of this Section, in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.

53.     The Chicago Faucet Shoppe and other Class members are "consumers" or "persons," as defined under the ICFA, 815 ILCS 505/1 *et seq.*, and other Consumer Protection Laws.

54.     Nestle Waters' conduct alleged in this complaint occurred in the course of trade and commerce.

55.     At all relevant times, Nestle Waters was engaged in the design, manufacturing, assembling, distributing, conveying, selling, and/or delivering of the 5-gallon bottled water in the ordinary course of business. Nestle Waters designed, manufactured, assembled, conveyed and/or sold the 5-gallon bottled water to consumers, knowing that the water would be consumed as an alternative to municipal tap water and in a place where municipal tap water was readily available.

11

56.    Nestle Waters was aware or should have been aware that consumers purchased Ice Mountain® 5-gallon bottled water in order to consume spring water and not resold municipal tap water.

57.    Nestle Waters omitted the material fact that the Ice Mountain ® 5-gallon bottled water is not "100% Natural Spring Water" but is instead resold municipal tap water.

58.    The omission of this material fact was likely to mislead consumers and, in fact, did mislead The Chicago Faucet Shoppe and the Class members.

59.    Nestle Waters knew and was aware that if it prominently disclosed on the website www.icemountainwater.com, on its invoices, and on its delivery trucks, that its Ice Mountain® 5-Gallon bottled water was resold municipal tap water and not "100% Natural Spring Water," that Nestle Waters would have had to charge substantially less for the Ice Mountain® 5-gallon bottled water.

60.    Nestle created its www.icemountainwater.com website, invoices, and delivery truck design with the intent that The Chicago Faucet Shoppe and the Class members would rely on the information provided, and omitted the material fact that the 5-gallon bottled water was not "100% Natural Spring Water" but was actually resold municipal tap water.

61.    Had Nestle Waters not engaged in the deceptive omission of the material fact described above, The Chicago Faucet Shoppe and the members of the Class would have been presented with an informed choice—whether or not to buy 5-gallon bottled water that contained resold municipal tap water and not "100% Natural Spring Water."

62.    Nestle Waters' material omissions to The Chicago Faucet Shoppe and the Class members constitute unfair and deceptive acts or practices in violation of the Consumer Fraud and Deceptive Business Practices Act of the State of Illinois and other states' Consumer Protection

12

Laws. The Chicago Faucet Shoppe would not have purchased the 5-gallon bottled water if it had been disclosed that the 5-gallon bottled water was resold municipal tap water and not "100% Natural Spring Water."

63.     The Chicago Faucet Shoppe and the Class members have been deprived of the right to have purchased the 5-gallon bottled water with full knowledge of the fact that the 5-gallon bottled water was resold municipal tap water and not "100% Natural Spring Water."

64.     The Chicago Faucet Shoppe and the Class members were damaged by the Nestle Waters' conduct. The purpose of that conduct, directed at consumers, was to create demand for and sell the 5-gallon bottled water. Each aspect of Nestle's conduct combined to create sales of the 5-gallon bottled water in an unscrupulous and unethical manner. The 5-gallon bottled water was overpriced because it did not contain "100% Natural Spring Water," but instead contained merely resold municipal tap water. Nestle Waters could not have sold the 5-gallon bottled water at the price charged if consumers had been made aware that the 5-gallon bottled water was resold municipal tap water, not "100% Natural Spring Water."

65.     As a direct and proximate result of Nestle Waters' wrongful conduct, The Chicago Faucet Shoppe and the Class members have been damaged in that they would not have paid the price they did but for the wrongful conduct.

WHEREFORE, The Chicago Faucet Shoppe requests that the Court enter judgment in favor of it and the members of the Class and against Nestle Waters for:

(A)     Actual and punitive damages;

(B)     An injunction mandating disclosures;

(C)     Restitution, disgorgement, and other equitable monetary relief;

(D)     Attorneys' fees, litigation expenses, and costs; and

13

(E)     Any other relief this Court deems equitable and just.

### Count II—Unjust Enrichment

66.     The Chicago Faucet Shoppe incorporates each preceding paragraph of this Complaint as if fully set forth below.

67.     Nestle Waters received the benefit of money from The Chicago Faucet Shoppe and members of the Class having purchased the 5-gallon bottle water at issue in this case under circumstances in which, according to equity and good conscience, Nestle Waters ought not to retain such benefit.

68.     Nestle Waters received money from the Chicago Faucet Shoppe and the Class members from the payment for the 5-gallon bottled water, which payments were excessive and unreasonable as a result of Nestle Waters' omission that its 5-gallon bottled water was not "100% Natural Spring Water," but was actually resold municipal tap water.

69.     Nestle Waters failure to clearly notify intended purchasers that the 5-gallon bottled water was resold municipal tap water and not "100% Natural Spring Water" allowed for Nestle Waters to inequitably profit from the sale of the 5-gallon bottled water.

70.     As a result of the conduct alleged in this complaint, The Chicago Faucet Shoppe and other members of the Class have conferred a benefit on Nestle Waters, Nestle Waters is aware of this benefit, and Nestle Waters voluntarily accepted and retained the benefit conferred on it.

71.     Nestle Waters will be unjustly enriched if it is allowed to retain such funds, and each Class member is entitled to an amount equal to the amount by which each Class member enriched Nestle Waters and for which Nestle Waters has been unjustly enriched.

14

72.   Nestle Waters is liable to The Chicago Faucet Shoppe and members of the Class

in the amount by which each Class member enriched Nestle Waters.

WHEREFORE, The Chicago Faucet Shoppe requests that the Court enter judgment in

favor of it and the members of the Class and against Nestle Waters for:

(A)   An order that Nestle Waters must disgorge all monies unjustly retained through its
unfair marketing and sale of the 5-gallon bottled water to the detriment of The
Chicago Faucet Shoppe and the Class members.

(B)   Any other relief this Court deems equitable and just.

### DEMAND FOR JURY TRIAL

The Chicago Faucet Shoppe requests a jury trial on any and all counts for which trial by

jury is permitted by law.

Dated:                                                     Respectfully submitted,



Michael J. Newman
5725 Old Orchard Rd., Suite 5
Skokie, IL 60077
Telephone: (847) 673-4003
Facsimile: (847) 673-4007
michael@mjnlawoffices.com

*Counsel for Plaintiff*

Irwin B. Levin, Indiana Bar No. 8786-49
Richard E. Shevitz, Indiana Bar No. 12007-49
Lynn A. Toops, Indiana Bar No. 26386-49A
COHEN & MALAD, LLP
One Indiana Square, Ste. 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2495
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
ltoops@cohenandmalad.com

*Of Counsel*

15

**Exhibit A**

## MY SPRING WATER



## REGIONAL MAP

No matter where you live in our nation, there's likely to be a premium Nestlé Waters spring water brand available for delivery to your door. Simply mouse over your region on the map to see whether Poland Spring®, Arrowhead®, Deer Park®, Ice Mountain®, Ozarka® or Zephyrhills®, spring bottled water brands are available in your area. Then, click on the associated links for more information or to begin the bottled water delivery ordering process.

# Spring Water Availability



➤ Click here to get Ice Mountain® delivered to your door

Ice Mountain® Natural Spring Water
Founded: 1987
Midwest
Nestlé Waters brand: 1989

Do you have questions about home or office water delivery?

[ Learn More ▸ ]

Tracing its sources back thousands of years to glaciers that covered much of the Northern U.S. and Canada, Ice Mountain® Brand Natural Spring Water emerges as springs found in certain Midwest and Mid–Atlantic state locations. In all cases, the quality, taste and mineral composition are the result of the unique natural properties of the area.

Learn more about pure, refreshing Ice Mountain® products.▸

**Exhibit B**



**Exhibit C**



◄ Home

# MY SPRING WATER

| SPRING WATER INFORMATION | HEALTH & FITNESS | GET QUALITY WATER | SPRING WATER INDUSTRY | FIND OUT MORE |

Commitment to the Environment  •  Source Management  •  Security  •  Careers

## SOURCE MANAGEMENT

🖶 Print this page

🏠 Find great water in your area.

# Precious resources are treated that way

Managing our water resources is our most important responsibility. It's more than just business; it's the right thing to do. From careful selection of our springs to daily monitoring of our sources and the surrounding environment, we work tirelessly to protect their health and sustainability. This also ensures that surrounding plant and animal habitats, wetlands and riparian areas remain vital and diverse. Here's how we do it:

Selecting a Spring Water Source When considering a new source, we look for a healthy and protected ecosystem, an abundant water supply, and spring water that's natural and great tasting.

Finding a Healthy and Protected Ecosystem The siting process includes studies of aquatic life, soils, wildlife, wetlands, riparian areas and surface waters. We conduct extensive research, including historic and cultural influences, and land-use practices dating back more than 100 years.

Water Quantity We take only what nature can replenish. We research historical and geologic records for information on abundant resources, and then conduct extensive hydrologic studies. Recharge patterns are critical in determining the amount of water a spring can safely yield.

Taste Tests Each spring has a unique "taste fingerprint" defined by its natural mineral composition. In addition to extensive chemical analyses, experienced water tasters within the company conduct taste panels to confirm that the best tasting springs are used.



A tiny drop of water will contain millions and millions of water molecules. One liter of water contains about 33 trillion water molecules!

## Security

Our water sources are our most precious natural and national resource. That's why it's important that they're totally secure.



Find great water in your area.  | ZIP code |  GO   Why my Zip?  ▸ See where we deliver

Contact Us  |  Privacy Policy  |  Legal  |  Sitemap

© Nestlé Waters North America Inc.

**Exhibit D**



◄ Home

# MY SPRING WATER

SPRING WATER INFORMATION  |  HEALTH & FITNESS  |  GET QUALITY WATER  |  SPRING WATER INDUSTRY  |  FIND OUT MORE

Delivery  |  Common Questions  |  Regional map  |  Available products

## DELIVERY

🖨 Print this page

Find great water in your area.

## Like your own spring, only steps away

Imagine having fresh, great-tasting spring water right in your home or office any time you want it. The fact is it's never been easier. No last minute trips to the store. No lugging water bottles home. Of course, you'll never have to worry about running out of water. And you don't even have to be home for a **water delivery**. Just tell us where you want your delivery left on your premises, and we'll take care of the rest. It doesn't get much more convenient than that.

Every 3-4 weeks you'll have pure, refreshing spring water in 5-gallon bottles or cases delivered right to your door. Then every few weeks we'll pick up the empty water bottles at the prearranged location. It's that simple.

Just enter your zip code at lower left of any page on this site to get started. Like we said, it's simple.

A dripping faucet can waste up to 2,000 gallons of water per year.



## Common Questions

Most of your questions and concerns about home or office water delivery can be answered right here.  ▷

Find great water in your area.  [ ZIP code ]   GO  Why my Zip?  |  ▸ See where we deliver

Contact Us  |  Privacy Policy  |  Legal  |  Sitemap

© Nestlé Waters North America Inc.

FILED - CH
CLERK OF THE CIRCUIT COURT

IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION
2012 SEP 14  PM 2: 46

THE CHICAGO FAUCET SHOPPE, )
INC., on behalf of itself and all others )    Case No. 2012-CH-34208
similarly situated, )
 )
               Plaintiff, )
 )
         vs. )
 )
NESTLE WATERS NORTH AMERICA, )
INC. )
 )
               Defendant. )
 )

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiff The Chicago Faucet Shoppe, Inc., by counsel, respectfully moves the Court to

certify this case as a class action under 735 ILCS 5/2-801 on behalf of the following Class:

> All persons in Illinois, Michigan, Minnesota, and Missouri who purchased Ice
> Mountain® 5-gallon bottled water in the five years preceding the filing of this
> complaint.

Plaintiff further requests that the Court appoint it as representative of the above-described Class

and appoint its counsel as Class counsel.

FILED - CH
CLERK OF THE CIRCUIT COURT
CHANCERY DIVISION

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

——————————————————CLERK
DOROTHY BROWN

| | |
|---|---|
| **THE CHICAGO FAUCET SHOPPE,** INC., on behalf of itself and all others similarly situated, | ) ) ) Case No. 2012-CH-34208 |
| | ) |
| Plaintiff, | ) ) |
| | ) |
| vs. | ) ) |
| | ) |
| **NESTLE WATERS NORTH AMERICA,** INC. | ) ) |
| | ) |
| Defendant. | ) ) |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

### I.    Introduction

This is a case under the Illinois Consumer Fraud and Deceptive Business Practices Act

("ICFA") on behalf of consumers in Illinois, Michigan, Minnesota, and Missouri, and is based on

Defendant Nestle Waters North America, Inc.'s ("Nestle Waters") uniform omission of a critical

disclosure to consumers in these states, all of which have statutes similar to the ICFA. Nestle

Waters uniformly fails to disclose that its Ice Mountain® 5-gallon bottled water that it markets as

"100% Natural Spring Water" is *not* 100% natural spring water, but instead actually is nothing

more than resold municipal tap water. Ice Mountain® 5-gallon bottled water can only be

purchased on the Ice Mountain® website or by phone—the consumer doesn't see the actual

product prior to purchase—and the only information available to the consumer prior to the

purchase is that Nestle Waters' Ice Mountain® bottled water is "100% Natural Spring Water."

Nestle Waters omits the critical disclosure that its Ice Mountain® 5-gallon bottled water is not

100% natural spring water and, in reality, is merely resold municipal tap water. Nestle Waters

Dated:                          Respectfully submitted,

                                Michael J. Newman
                                5225 Old Orchard Rd., Suite 5
                                Skokie, IL 60077
                                Telephone: (847) 673-4003
                                Facsimile: (847) 673-4007
                                michael@mjnlawoffices.com

                                *Counsel for Plaintiff*

                                Irwin B. Levin, Indiana Bar No. 8786-49
                                Richard E. Shevitz, Indiana Bar No. 12007-49
                                Lynn A. Toops, Indiana Bar No. 26386-49A
                                COHEN & MALAD, LLP
                                One Indiana Square, Ste. 1400
                                Indianapolis, IN 46204
                                Telephone: (317) 636-6481
                                Facsimile: (317) 636-2495
                                ilevin@cohenandmalad.com
                                rshevitz@cohenandmalad.com
                                ltoops@cohenandmalad.com

## CERTIFICATE OF SERVICE

I certify that service of this document is being made by United States Mail on the

following parties on the __17th__ day of __September__ , 2012:

CT Corporation System
Registered Agent for Nestle Waters North America, Inc.
208 S. LaSalle Street, Suite 814
Chicago, IL 60604

                                ~~Michael J. Newman~~    David Fink

2

was able to charge higher prices and sell larger quantities of the 5-gallon bottled water because it failed to disclose that those bottles do not contain the more popular spring water but actually only contain municipal supply water.

Like many other courts have done in similar ICFA cases based on omissions of material fact, this Court should certify this case as a class action. *See, e.g., Saltzman v. Pella Corp.*, 257 F.R.D. 471 (N.D. Ill. 2009) (certifying liability class where defendant fraudulently concealed an inherent product defect) ("Because this case involves a failure to disclose, reliance is presumed. No individualized inquiry is required.") (collecting cases); *Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493 (N.D. Ill. 1998) (certifying class where Gerber failed to disclose that its baby food included starches and sugars). *See also Jamison v. Summer Infant (USA), Inc.*, 778 F.Supp.2d 900 (N.D. Ill. 2011) (denying motion to dismiss ICFA claim where complaint alleged defendants' advertisements failed to disclose that baby monitors were unencrypted).

## II.    Facts in Support of Class Certification

Nestle Waters is the largest bottled water company in the United States. (Compl. ¶ 17.) It represented 36.4% of the bottled water market in 2010 with sales of $4.11 billion. (*Id.*) Bottled water manufacturers and distributors, like Nestle Waters, differentiate some of their bottled water products by getting the water from sources other than local municipal water supplies, like a natural spring. Nestle Waters makes more money from the sales of spring water not only because it can charge consumers more money for bottled spring water but also because spring water is a more popular bottled water product. (*Id.* ¶¶ 11, 12, 23–26) (discussing benefits of spring water over municipal tap water). Recently, sales of municipal bottled water have grown only slightly, but sales of bottled spring water have grown substantially. (*Id.* ¶ 13.) Because spring water sells for higher prices and in greater amounts, Nestle Waters omits the critical disclosure that its Ice

2

Mountain® 5-gallon bottled water is not spring water and instead comes from local municipal water supplies. (*Id.* ¶ 14.)

Sales of 5-gallon bottled spring water provide the convenience of the delivery of spring water to homes and offices where regular municipal supply water also is available. (*Id.* ¶ 27.) Of course, because the 5-gallon bottles are too heavy to be purchased at a store and transported to the home or office by the purchaser, Nestle Waters sells Ice Mountain® 5-gallon jugs only by phone and through its website, www.icemountainwater.com. (*Id.* ¶ 23.) Unlike an in-person retail transaction, therefore, consumers do not physically view the product in a retail location, and the only information available to them is limited entirely to the message that Nestle Waters makes available to the consumer on the Ice Mountain® website, in commercials, and the logos on Ice Mountain® trucks which deliver the 5-gallon bottles, all of which consistently characterize the product as "100% Natural Spring Water." (*Id.* ¶ 28.) All of that available information consistently omits the critical disclosure that Ice Mountain® 5-gallon bottled water actually is from a regular municipal water supply, and is *not* 100% natural spring water. For example, the www.icemountainwater.com website provides:

3





(*Id; see also* http://www.icemountainwater.com/#/home.)

Nestle Waters' own website reinforces this omission by repeatedly stating that "you'll have pure, refreshing spring water in 5 gallon bottles or cases delivered right to your door" much like having "your own spring, steps away":

4

> Like your own spring, only steps away[.] Imagine having fresh, great-tasting spring water right in your home or office any time you want it. . . . Every 3-4 weeks you'll have pure, refreshing spring water in 5-gallon bottles or cases delivered right to your door. . . .

(*Id.* ¶ 29 & Ex. D.) Nestle Waters' website also further reinforces this omission by presenting a picture of a home delivery of a 5-gallon bottle along with the statement that it is "100% Natural Spring Water":



(*Id.* ¶ 30; *see also* http://www.waterdeliveryoffers.com/index.cfm.)

Nestle Waters completely fails to disclose that its Ice Mountain® 5-gallon jugs actually contain resold municipal tap water and not "100% Natural Spring Water." (*Id.* ¶ 31.) Of course, these 5-gallon bottles would sell for less money and to fewer customers if Nestle Waters had disclosed that it did not contain 100% natural spring water but instead contained nothing more than resold municipal tap water. (*Id.* ¶ 32.)

### III.    The Claims Raised in the Complaint

The two-count complaint alleges that Nestle Waters violated section 2 of the ICFA, 815

ILCS 505/2 (*Id.* ¶¶ 49–65) and the similar statutes in Michigan, Minnesota, and Missouri, and

alleges that Nestle Waters was unjustly enriched to the detriment of consumers (*Id.* ¶¶ 66–72.).

### IV.    The Plaintiff Class

The Plaintiff seeks to certify the following Plaintiff Class pursuant to 735 ILCS 5/2-801

composed of consumers in states in which Nestle Waters marketed its Ice Mountain® 5-gallon

bottled water as "100% Natural Spring Water" and which have consumer fraud statutes that are

substantively similar to the IFCA (Mich. Comp. Laws § 445.903; Minn. Stat. § 325F.69; §

407.020 R.S.Mo.[1]:

> All persons in Illinois, Michigan, Minnesota, and Missouri who purchased Ice
> Mountain® 5-gallon bottled water in the five years preceding the filing of this
> complaint.

### V.    The Court Should Certify the Plaintiff Class Under 735 ILCS 5/2-801.

#### A.    Overview of 735 ILCS 5/2-801.

As the Court is aware, "[c]ertification of a class action in Illinois is governed by section

2-801 of the Code of Civil Procedure (Code), which mandates four findings by the trial court for

class certification:

> (1) The class is so numerous that joinder of all members is impracticable.
>
> (2) There are questions of fact or law common to the class, which common questions
> predominate over any questions affecting only individual members.
>
> (3) The representative parties will fairly and adequately protect the interest of the class.
>
> (4) The class action is an appropriate method for the fair and efficient adjudication of the
> controversy."

*S37 Mgmt., Inc. v. Advance Refrigeration Co.*, 961 N.E.2d 6, 10 (Ill. App. Ct. 2011).

---

[1] The text of each of those statutes is attached as Exhibit A.

Plaintiff bears the burden of establishing all four prerequisites of section 2-801. *Id.* "The decision to certify a class lies within the trial court's discretion." *Id.* at 11. "In exercising its discretion, the trial court ''should err in favor of maintaining class [certification].''" *Id.* (quoting *Ramirez v. Midway Moving & Storage, Inc.*, 880 N.E.2d 653 (Ill. App. Ct. 2007) (quoting *Clark v. TAP Pharmaceutical Prods., Inc.*, 798 N.E.2d 123 (Ill. App. 2003))).

"[T]he trial court may conduct any factual inquiry necessary to resolve the issue of class certification presented by the record. However, . . . the trial court's discretion is limited to an inquiry 'into whether [the] plaintiff is asserting a claim which, assuming its merits, will satisfy the requirement of [section 2-801] as distinguished from an inquiry into the merits of [the] plaintiff's particular individual claims.'" *Cruz v. Unilock Chicago*, 892 N.E.2d 78, 92 (Ill. App. Ct. 2008) (quoting *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 677 (7th Cir. 2001) (quotation omitted)). "Thus, the trial court is not to determine the merits of the complaint, but only the propriety of class certification, and its factual inquiry and resolution of factual issues is to be limited solely to that determination." *Id.*[2] Under *Szabo* and *Cruz*, there are no factual inquiries or factual issues to be resolved in determining whether class certification is appropriate because reliance is presumed in omission cases under the IFCA and similar statutes and because the element of causation can be uniformly established with class-wide proof based on Nestle Waters' uniform failure to disclose that its Ice Mountain® 5-gallon bottled water was not spring water which allowed Nestle Waters to charge more for the 5-gallon bottles of water and to sell more of that product. This Court should certify the Plaintiff Class.

---

[2] Illinois courts also "note the danger of allowing a defendant to assist in determining class certification, because it is 'a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house.'" *Cruz*, 892 N.E.2d at 92.

### B. This Case Meets All Four Requirements of 735 ILCS 5/2-801.

#### 1. The Plaintiff Class Is So Numerous That Joinder of All Members Is Impracticable.

The "numerosity" element of section 2-801 requires that the members of the class be "so numerous that joinder of all members is impracticable." "[P]laintiffs need not demonstrate a precise figure for the class size, because a good-faith, nonspeculative estimate will suffice . . . ." *Cruz*, 892 N.E.2d at 97 (citing *Arenson v. Whitehall Convalescent & Nursing Home, Inc.*, 164 F.R.D. 659, 662 (N.D. Ill. 1996) ("the court is entitled to make common sense assumptions in order to support a finding of numerosity"). In 2009, Ice Mountain® sold over $261 million in bottled water. (Ex. B.) Ice Mountain® is only sold to consumers in 11 states. (Compl. ¶ 19.) Therefore, based on the hundreds of millions of dollars in Ice Mountain® bottled water sales in only 11 states, a good-faith, nonspeculative estimate is that the class consists of at least thousands of members, and "joinder of all class members is impracticable." *See Cruz*, 892 N.E.2d at 97 (finding numerosity when the plaintiffs offered "a good-faith estimate of the class size approaching 200 individuals); *Arenson*, 164 F.R.D. at 662 (finding numerosity where "there appears to be at least 159 members of the putative class").

#### 2. Common Questions of Fact or Law Predominate Over Questions Affecting Only Individual Class Members.

"To satisfy the second requirement of class certification, *i.e.*, that a common question of fact or law predominates over questions affecting only individual class members, the plaintiff must show that the successful adjudication of the plaintiff's individual claims will establish a right of recovery in favor of the other class members." *S37 Mgmt, Inc.*, 961 N.E.2d at 11. "A common question may be shown where the claims of the individual class members are based on the common application of a statute where the members are aggrieved by the same or similar

8

conduct." *Ramirez*, 863 N.E.2d at 816. "A class action can properly be prosecuted where defendants allegedly acted wrongfully in the same basic manner as to an entire class. In such circumstances, the common class questions predominate in the case, and the class action is not defeated." *Id.* "A class action will not be defeated solely because factual variations exist among class members' grievances." *Id.* (collecting cases). "It is appropriate to litigate the questions of fact common to all members of the class and, after the determination of the common questions, to determine in an ancillary proceeding the questions that may be peculiar to an individual class member." *Id.*

As in other cases bringing claims under the ICFA, each class member's claim in this case arises from a single course of conduct by Nestle Waters, namely Nestle Waters' uniform omission of a critical disclosure to its consumers—that its Ice Mountain® 5-gallon bottled water is *not* 100% natural spring water but is actually resold municipal tap water. *See Saltzman*, 257 F.R.D. 471 (certifying liability class where defendant fraudulently concealed an inherent product defect); *Tylka*, 178 F.R.D. 493 (certifying class where Gerber failed to disclose that its baby food included starches and sugars). The focus of the claims under the IFCA and similar statutes is on Nestle Waters' conduct, not each consumer's subjective belief. *See Tylka*, 178 F.R.D. at 499 ("Gerber argues in the alternative that despite the existence of commonality, individual fact issues among the Plaintiffs predominate. Specifically, Gerber claims that materiality, reliance, and causation are fact issues which each Plaintiff must separately prove to establish Gerber's liability under the ICFA and Illinois common law. However, Gerber's effort to shift the focus of our inquiry to individual class Plaintiffs' actions and subjective beliefs is misplaced and runs contrary to established law."); *Saltzman*, 257 F.R.D. 471 ("Because this case involves a failure to disclose, reliance is presumed. No individualized inquiry is required.") (collecting cases); *id.* at

9

479–80 ("In cases where plaintiffs allege fraud by omission, relevant state laws apply an objective standard in the determination of whether the omission was material. [Plaintiff's] reasons for purchasing [the product in question] is not relevant to this inquiry.").

Commonality and predominance is also present under the statutes at issue in Michigan, Minnesota, and Missouri. In *Saltzman*, the district court held that the statutes of "Illinois [and] Michigan . . . have nearly identical elements" and "the factual and legal questions to be answered [under those statutes] are substantively the same." 257 F.R.D. at 484 n.12 (citing *Dix v. Am. Bankers Life Assur. Co. of Florida*, 429 Mich. 410, 415 N.W.2d 206, 209 (1987) ("We hold that members of a class proceeding under the Consumer Protection Act need not individually prove reliance")). Minnesota and Missouri have similar statutes. *See State ex rel. Webster v. Areaco Inv. Co*, 756 S.W.2d 633, 635 (Mo. Ct. App. 1988) ("We also do not find that proof of reliance by customers is a necessary element of [chapter 407RS Mo] cases."); *Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 13 (Minn. 2001) ("the showing of reliance that must be made to prove a casual nexus need not include direct evidence of reliance by individual consumers of defendants' products. Rather, the causal nexus and its reliance component may be established by other direct or circumstantial evidence that the district court determines is relevant and probative as to the relationship between the claimed damages and the alleged prohibited conduct."); *see id.* ("To impose a requirement of proof of individual reliance in the guise of causation would reinstate the strict common law reliance standard that we have concluded the legislature meant to lower for these statutory actions. Moreover, we are confident that the legislature would not have authorized private damages actions such as this, where the alleged misrepresentations are claimed to have affected a large number of consumers, while retaining a strict burden of proof that depends on evidence of individual consumer reliance.") Here, Plaintiff alleged a uniform

10

causal link in the form of Nestle Waters charging more for its 5-gallon bottled water because of

the uniform material omission, thus, causation can be shown with class-wide proof.

The predominant common questions of law and fact arising from this shared factual

scenario include, but are not limited to, the following: (i) whether Nestle Waters engaged in a

pattern or practice of selling Ice Mountain® 5-gallon bottled water without disclosing that those

bottles did not contain 100% natural spring water; (ii) whether Nestle Waters concealed the

material fact that it was selling Ice Mountain® 5-gallon bottled water without disclosing that

those jugs did not contain 100% natural spring water; (iii) whether, in order to increase sales and

prices on Ice Mountain® 5-gallon bottled water, Nestle Waters intentionally omitted that the Ice

Mountain® 5-gallon bottled water was not 100% natural spring water; (iv) whether Nestle

Waters engaged in consumer fraud and unfair or deceptive trade practices under the Illinois

Consumer Fraud Act and the substantially similar consumer protection statutes of Michigan,

Minnesota, and Missouri; (v) whether Nestle Waters was unjustly enriched because it was able to

sell Ice Mountain® 5-gallon bottled water at a higher price than consumers would have paid but

for the omission. Thus, common issues predominate over any issues that affect only individual

class members.

### 3. The Plaintiff Will Fairly and Adequately Protect the Interest of the Class.

"Section 2-801(3) requires that the representative parties will fairly and adequately

protect the interests of the class." *Cruz*, 892 N.E.2d at 103. "To adequately represent the class,

the proposed class action plaintiff must be a member of the class." *Ramirez*, 863 N.E.2d at 810.

"In other words, the named plaintiff must be able to maintain an individual cause of action

against the defendant." *Id.* "Named plaintiffs must also establish that they are not seeking relief

which is potentially antagonistic to the non-represented members of the class." *Id.* "The purpose

11

of the adequate representation requirement is merely to ensure that all class members will receive proper and efficient protection of their interests in the proceedings." *Id.* "It has long been recognized that a plaintiff bringing a class action suit need only allege a viable individual cause of action, indicate that the claim is being brought as a class action, and include factual allegations broad enough to establish the possible existence of a class action." *Id.*

Plaintiff's claims against Nestle Waters are identical to the proposed class's claims against Nestle Waters, and there is no antagonism in this case. The Plaintiff has a genuine interest in and commitment to the outcome of the suit that will ensure proper and efficient protection of the proposed class's interests. Furthermore, the Plaintiff's counsel has extensive experience in class action litigation, as set forth in the Firm Resume of Cohen & Malad, LLP, attached as Exhibit C. No basis exists to question the adequacy of Plaintiff or its counsel to prosecute this action.

### 4. Superiority

"The last prerequisite is that a class action must be an appropriate method to fairly and efficiently adjudicate the controversy." *Cruz*, 892 N.E.2d at 104. "The appropriateness requirement is satisfied if the plaintiff can demonstrate that 'the class action (1) can best secure the economies of time, effort, and expense and promote a uniformity of decision or (2) can accomplish the other ends of equity and justice that class actions seek to obtain." *Id.* (quotation omitted). "The fact that [a court] ha[s] determined that plaintiffs have established the previous three prerequisites (numerosity, commonality, representation) makes it evident that a class action is appropriate." *Id.*

The numerous members in the proposed class and the existence of predominant common questions of fact and law establish that a class action could serve the economies of time, effort,

12

and expense as well as prevent inconsistent results. Litigating the claims on an individual basis would waste judicial resources, while addressing the common and predominating issues in a single action would aid judicial efficiency. Therefore, a class action is the appropriate method to fairly and efficiently adjudicate this controversy.

Dated:                                        Respectfully submitted,

_____

Michael J. Newman
5225 Old Orchard Rd., Suite 5
Skokie, IL 60077
**Telephone: (847) 673-4003**
**Facsimile: (847) 673-4007**
michael@mjnlawoffices.com

*Counsel for Plaintiff*

Irwin B. Levin, Indiana Bar No. 8786-49
Richard E. Shevitz, Indiana Bar No. 12007-49
Lynn A. Toops, Indiana Bar No. 26386-49A
COHEN & MALAD, LLP
One Indiana Square, Ste. 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2495
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
ltoops@cohenandmalad.com

## CERTIFICATE OF SERVICE

I certify that service of this document is being made by United States Mail on the

following parties on the _____ day of _____, 2012:

CT Corporation System
Registered Agent for Nestle Waters North America, Inc.
208 S. LaSalle Street, Suite 814
Chicago, IL 60604

_____

Michael J. Newman

13

# EXHIBIT A

Michigan Compiled Laws Annotated
   Chapter 445. Trade and Commerce
     Michigan Consumer Protection Act (Refs & Annos)

M.C.L.A. 445.903

445.903. Unfair, unconscionable, or deceptive methods, acts, or practices; rules

Currentness

Sec. 3. (1) Unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful and are defined as follows:

(a) Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

(b) Using deceptive representations or deceptive designations of geographic origin in connection with goods or services.

(c) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have.

(d) Representing that goods are new if they are deteriorated, altered, reconditioned, used, or secondhand.

(e) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

(f) Disparaging the goods, services, business, or reputation of another by false or misleading representation of fact.

(g) Advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented.

(h) Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity in immediate conjunction with the advertised goods or services.

(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions.

(j) Representing that a part, replacement, or repair service is needed when it is not.

(k) Representing to a party to whom goods or services are supplied that the goods or services are being supplied in response to a request made by or on behalf of the party, when they are not.

(l) Misrepresenting that because of some defect in a consumer's home the health, safety, or lives of the consumer or his or her family are in danger if the product or services are not purchased, when in fact the defect does not exist or the product or services would not remove the danger.

(m) Causing a probability of confusion or of misunderstanding with respect to the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction.

(n) Causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction.

(o) Causing a probability of confusion or of misunderstanding as to the terms or conditions of credit if credit is extended in a transaction.

(p) Disclaiming or limiting the implied warranty of merchantability and fitness for use, unless a disclaimer is clearly and conspicuously disclosed.

(q) Representing or implying that the subject of a consumer transaction will be provided promptly, or at a specified time, or within a reasonable time, if the merchant knows or has reason to know it will not be so provided.

(r) Representing that a consumer will receive goods or services "free" or "without charge", or using words of similar import in the representation, without clearly and conspicuously disclosing with equal prominence in immediate conjunction with the use of those words the conditions, terms, or prerequisites to the use or retention of the goods or services advertised.

(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.

(t) Entering into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law, unless the waiver is clearly stated and the consumer has specifically consented to it.

(u) Failing, in a consumer transaction that is rescinded, canceled, or otherwise terminated in accordance with the terms of an agreement, advertisement, representation, or provision of law, to promptly restore to the person or persons entitled to it a deposit, down payment, or other payment, or in the case of property traded in but not available, the greater of the agreed value or the fair market value of the property, or to cancel within a specified time or an otherwise reasonable time an acquired security interest.

(v) Taking or arranging for the consumer to sign an acknowledgment, certificate, or other writing affirming acceptance, delivery, compliance with a requirement of law, or other performance, if the merchant knows or has reason to know that the statement is not true.

(w) Representing that a consumer will receive a rebate, discount, or other benefit as an inducement for entering into a transaction, if the benefit is contingent on an event to occur subsequent to the consummation of the transaction.

(x) Taking advantage of the consumer's inability reasonably to protect his or her interests by reason of disability, illiteracy, or inability to understand the language of an agreement presented by the other party to the transaction who knows or reasonably should know of the consumer's inability.

(y) Gross discrepancies between the oral representations of the seller and the written agreement covering the same transaction or failure of the other party to the transaction to provide the promised benefits.

(z) Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold.

(aa) Causing coercion and duress as the result of the time and nature of a sales presentation.

(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is.

(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

(dd) Subject to subdivision (ee), representations by the manufacturer of a product or package that the product or package is 1 or more of the following:

(i) Except as provided in subparagraph (ii), recycled, recyclable, degradable, or is of a certain recycled content, in violation of guides for the use of environmental marketing claims, 16 CFR part 260.

(*ii*) For container holding devices regulated under part 163 of the natural resources and environmental protection act, 1994 PA 451, MCL 324.16301 to 324.16303, representations by a manufacturer that the container holding device is degradable contrary to the definition provided in that act.

(ee) Representing that a product or package is degradable, biodegradable, or photodegradable unless it can be substantiated by evidence that the product or package will completely decompose into elements found in nature within a reasonably short period of time after consumers use the product and dispose of the product or the package in a landfill or composting facility, as appropriate.

(ff) Offering a consumer a prize if in order to claim the prize the consumer is required to submit to a sales presentation, unless a written disclosure is given to the consumer at the time the consumer is notified of the prize and the written disclosure meets all of the following requirements:

(*i*) Is written or printed in a bold type that is not smaller than 10-point.

(*ii*) Fully describes the prize, including its cash value, won by the consumer.

(*iii*) Contains all the terms and conditions for claiming the prize, including a statement that the consumer is required to submit to a sales presentation.

(*iv*) Fully describes the product, real estate, investment, service, membership, or other item that is or will be offered for sale, including the price of the least expensive item and the most expensive item.

(gg) Violating 1971 PA 227, MCL 445.111 to 445.117, in connection with a home solicitation sale or telephone solicitation, including, but not limited to, having an independent courier service or other third party pick up a consumer's payment on a home solicitation sale during the period the consumer is entitled to cancel the sale.

(hh) Except as provided in subsection (3), requiring a consumer to disclose his or her social security number as a condition to selling or leasing goods or providing a service to the consumer, unless any of the following apply:

(*i*) The selling, leasing, providing, terms of payment, or transaction includes an application for or an extension of credit to the consumer.

(*ii*) The disclosure is required or authorized by applicable state or federal statute, rule, or regulation.

(*iii*) The disclosure is requested by a person to obtain a consumer report for a permissible purpose described in section 604 of the fair credit reporting act, 15 USC 1681b.

(*iv*) The disclosure is requested by a landlord, lessor, or property manager to obtain a background check of the individual in conjunction with the rent or leasing of real property.

(*v*) The disclosure is requested from an individual to effect, administer or enforce a specific telephonic or other electronic consumer transaction that is not made in person but is requested or authorized by the individual if it is to be used solely to confirm the identity of the individual through a fraud prevention service database. The consumer good or service shall still be provided to the consumer upon verification of his or her identity if he or she refuses to provide his or her social security number but provides other information or documentation that can be used by the person to verify his or her identity. The person may inform the consumer that verification through other means than use of the social security number may cause a delay in providing the service or good to the consumer.

(ii) If a credit card or debit card is used for payment in a consumer transaction, issuing or delivering a receipt to the consumer that displays any part of the expiration date of the card or more than the last 4 digits of the consumer's account number. This subdivision does not apply if the only receipt issued in a consumer transaction is a credit card or debit card receipt on which

the account number or expiration date is handwritten, mechanically imprinted, or photocopied. This subdivision applies to any consumer transaction that occurs on or after March 1, 2005, except that if a credit or debit card receipt is printed in a consumer transaction by an electronic device, this subdivision applies to any consumer transaction that occurs using that device only after 1 of the following dates, as applicable:

(*i*) If the electronic device is placed in service after March 1, 2005, July 1, 2005 or the date the device is placed in service, whichever is later.

(*ii*) If the electronic device is in service on or before March 1, 2005, July 1, 2006.

(jj) Violating section 11 of the identity theft protection act, 2004 PA 452, MCL 445.71.

(kk) Advertising or conducting a live musical performance or production in this state through the use of a false, deceptive, or misleading affiliation, connection, or association between a performing group and a recording group. This subdivision does not apply if any of the following are met:

(*i*) The performing group is the authorized registrant and owner of a federal service mark for that group registered in the United States patent and trademark office.

(*ii*) At least 1 member of the performing group was a member of the recording group and has a legal right to use the recording group's name, by virtue of use or operation under the recording group's name without having abandoned the name or affiliation with the recording group.

(*iii*) The live musical performance or production is identified in all advertising and promotion as a salute or tribute and the name of the vocal or instrumental group performing is not so closely related or similar to that used by the recording group that it would tend to confuse or mislead the public.

(*iv*) The advertising does not relate to a live musical performance or production taking place in this state.

(*v*) The performance or production is expressly authorized by the recording group.

(*ll*) Violating section 3e, 3f, 3g, 3h, or 3i. [1]

(2) The attorney general may promulgate rules to implement this act under the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328. The rules shall not create an additional unfair trade practice not already enumerated by this section. However, to assure national uniformity, rules shall not be promulgated to implement subsection (1)(dd) or (ee).

(3) Subsection (1)(hh) does not apply to either of the following:

(a) Providing a service related to the administration of health-related or dental-related benefits or services to patients, including provider contracting or credentialing. This subdivision is intended to limit the application of subsection (1)(hh) and is not intended to imply that this act would otherwise apply to health-related or dental-related benefits.

(b) An employer providing benefits or services to an employee.

Credits

Amended by P.A.1994, No. 46, 1, Imd. Eff. March 23, 1994; P.A.1994, No. 276, 1, Imd. Eff. July 11, 1994; P.A.1996, No. 74, 1, Imd. Eff. Feb. 26, 1996; P.A.1996, No. 226, 1, Imd. Eff. May 30, 1996; P.A.2000, No. 14, Imd. Eff. March 8, 2000; P.A.2002, No. 613, Imd. Eff. Dec. 20, 2002; P.A.2004, No. 455, Eff. March 1, 2005; P.A.2004, No. 459, Eff. March 1, 2005; P.A.2004, No. 461, Eff. March 1, 2005; P.A.2004, No. 462, Eff. March 1, 2005; P.A.2006, No. 508, Imd. Eff. Dec. 29, 2006; P.A.2008, No. 211, Eff. Nov. 1, 2008; P.A.2008, No. 310, Imd. Eff. Dec. 18, 2008. P.A.2010, No. 195, Imd. Eff. Oct. 5, 2010.

Notes of Decisions (132)

445.903. Unfair, unconscionable, or deceptive methods, acts, or..., MI ST 445.903

Footnotes

1       M.C.L.A. §§ 445.903e, 445.903f, 445.903g, 445.903h, or 445.903i

M. C. L. A. 445.903, MI ST 445.903

The statutes are current through P.A. 2012, No. 299, of the 2012 Regular Session, 96th Legislature.

End of Document

© 2012 Thomson Reuters. No claim to original U.S. Government Works.

Minnesota Statutes Annotated
  Trade Regulations, Consumer Protection (Ch. 324-338)
    Chapter 325F. Consumer Protection; Products and Sales
      Prevention of Consumer Fraud

M.S.A. § 325F.69

325F.69. Unlawful practices

Currentness

**Subdivision 1. Fraud, misrepresentation, deceptive practices.** The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

**Subd. 2. Referral and chain referral selling prohibited.** (1) With respect to any sale or lease the seller or lessor may not give or offer a rebate or discount or otherwise pay or offer to pay value to the buyer or lessee as an inducement for a sale or lease in consideration of the buyer's or lessee's giving to the seller or lessor the names of prospective purchasers or lessees, or otherwise aiding the seller or lessor in making a sale or lease to another person, if the earning of the rebate, discount or other value is contingent upon the occurrence of an event subsequent to the time the buyer or lessee agrees to buy or lease.

(2)(a) With respect to any sale or lease, it shall be illegal for any seller or lessor to operate or attempt to operate any plans or operations for the disposal or distribution of property or franchise or both whereby a participant gives or agrees to give a valuable consideration for the chance to receive something of value for inducing one or more additional persons to give a valuable consideration in order to participate in the plan or operation, or for the chance to receive something of value when a person induced by the participant induces a new participant to give such valuable consideration including such plans known as chain referrals, pyramid sales, or multilevel sales distributorships.

(b) The phrase "something of value" as used in paragraph (a) above, does not mean or include payment based upon sales made to persons who are not purchasing in order to participate in the prohibited plan or operation.

(3) If a buyer or lessee is induced by a violation of this subdivision to enter into a sale or lease, the agreement is unenforceable and the buyer or lessee has the option to rescind the agreement with the seller or lessor and, upon tendering the property received, or what remains of it, obtain full or in the case of remains, a proportional restitution of all sums paid, or retain the goods delivered and the benefit of any services performed without any further obligation to pay for them.

(4) With respect to a sale or lease in violation of this section an assignee of the rights of the seller or lessor is subject to all claims and defenses of the buyer or lessee against the seller or lessor arising out of the sale or lease notwithstanding an agreement to the contrary, but the assignee's liability under this section may not exceed the amount owing to the assignee at the time the claim or defense is asserted against the assignee. Rights of the buyer or lessee under this section can only be asserted as a matter of defense to or setoff against a claim by the assignee.

(5) In a sale or lease in violation of this section, the seller or lessor may not take a negotiable instrument other than a check as evidence of the obligation of the buyer or lessee. A holder is not in good faith if the holder takes a negotiable instrument with notice that it is issued in violation of this section.

(6) Any person who violates any provision of this subdivision shall be guilty of a gross misdemeanor.

**Subd. 3. Advertising media excluded.** Sections 325F.68 to 325F.70 shall apply to actions of the owner, publisher, agent or employee of newspapers, magazines, other printed matter or radio or television stations or other advertising media used for the publication or dissemination of an advertisement, only if the owner, publisher, agent, or employee has either knowledge of the false, misleading or deceptive character of the advertisement or a financial interest in the sale or distribution of the advertised merchandise.

**Subd. 4. Solicitation of money for merchandise not ordered or services not performed.** The act, use, or employment by any person of any solicitation for payment of money by another by any statement or invoice, or any writing that could reasonably be interpreted as a statement or invoice, for merchandise not yet ordered or for services not yet performed and not yet ordered, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

**Subd. 5. Prohibited going out of business sales.** It is illegal for any person to represent falsely that a sale is a "going out of business sale." Any representation that a sale is a "going out of business sale" is presumed to be false and illegal under this subdivision, if at that location or within a relevant market area:

(1) the sale has been represented to be a "going out of business sale" for a period of more than 120 days;

(2) the business has increased its inventory for the sale by ordering or purchasing an unusual amount of merchandise during the sale or during the 90 days before the sale began;

(3) the business, or any of its officers or directors, has advertised any other sale as a "going out of business sale" during the 120 days before this sale began; or

(4) the sale has continued after a date on which the business has represented, expressly or by reasonable implication, that the business would terminate.

Any presumption arising under clauses (1) to (4) may be rebutted if the business shows, by clear and convincing evidence, that the sale was in fact conducted in anticipation of the imminent termination of the business. This subdivision does not apply to a sale in any statutory or home rule charter city that by ordinance requires the licensing of persons conducting a "going out of business sale," nor to public officers acting in the course of their official duties.

**Subd. 6. Deceptive use of financial institution name.** No person shall include the name, trade name, logo, or tagline of a financial institution as defined in section 49.01, subdivision 2, in a written solicitation for financial services directed to a customer who has obtained a loan from the financial institution without written permission from the financial institution, unless the solicitation clearly and conspicuously states that the person is not sponsored by or affiliated with the financial institution, which shall be identified by name. This statement shall be made in close proximity to, and in the same or larger font size as, the first and most prominent use or uses of the name, trade name, logo, or tagline in the solicitation, including on an envelope or through an envelope window containing the solicitation. For purposes of this section, the term "financial institution" includes a financial institution's affiliates and subsidiaries. This subdivision shall not prohibit the use of a financial institution name, trade name, logo, or tagline of a financial institution if the use of that name is part of a fair and accurate comparison of like products or services.

Credits
Amended by Laws 1985, c. 148, § 3; Laws 1986, c. 444; Laws 2004, c. 228, art. 1, §§ 56, 57; Laws 2005, c. 118, § 17.


Notes of Decisions (224)

M. S. A. § 325F.69, MN ST § 325F.69
Current with legislation of the 2012 Regular Session effective through July 31, 2012

 © 2012 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Annotated Missouri Statutes
  Title XXVI. Trade and Commerce (Refs & Annos)
    Chapter 407. Merchandising Practices (Refs & Annos)

V.A.M.S. 407.020

407.020. Unlawful practices, penalty--exceptions

Currentness

1. The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice. The use by any person, in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri of the fact that the attorney general has approved any filing required by this chapter as the approval, sanction or endorsement of any activity, project or action of such person, is declared to be an unlawful practice. Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

2. Nothing contained in this section shall apply to:

(1) The owner or publisher of any newspaper, magazine, publication or printed matter wherein such advertisement appears, or the owner or operator of a radio or television station which disseminates such advertisement when the owner, publisher or operator has no knowledge of the intent, design or purpose of the advertiser; or

(2) Any institution, company, or entity that is subject to chartering, licensing, or regulation by the director of the department of insurance, financial institutions and professional registration under chapter 354, RSMo, or chapters 374 to 385, RSMo, the director of the division of credit unions under chapter 370, RSMo, or director of the division of finance under chapters 361 to 369, RSMo, or chapter 371, RSMo, unless such directors specifically authorize the attorney general to implement the powers of this chapter or such powers are provided to either the attorney general or a private citizen by statute.

3. Any person who willfully and knowingly engages in any act, use, employment or practice declared to be unlawful by this section with the intent to defraud shall be guilty of a class D felony.

4. It shall be the duty of each prosecuting attorney and circuit attorney in their respective jurisdictions to commence any criminal actions under this section, and the attorney general shall have concurrent original jurisdiction to commence such criminal actions throughout the state where such violations have occurred.

5. It shall be an unlawful practice for any long-term care facility, as defined in section 660.600, RSMo, except a facility which is a residential care facility or an assisted living facility, as defined in section 198.006, RSMo, which makes, either orally or in writing, representation to residents, prospective residents, their families or representatives regarding the quality of care provided, or systems or methods utilized for assurance or maintenance of standards of care to refuse to provide copies of documents which reflect the facility's evaluation of the quality of care, except that the facility may remove information that would allow identification of any resident. If the facility is requested to provide any copies, a reasonable amount, as established by departmental rule, may be charged.

6. Any long-term care facility, as defined in section 660.600, RSMo, which commits an unlawful practice under this section shall be liable for damages in a civil action of up to one thousand dollars for each violation, and attorney's fees and costs incurred by a prevailing plaintiff, as allowed by the circuit court.

407.020. Unlawful practices, penalty--exceptions, MO ST 407.020

**Credits**

(L.1967, p. 607, § 2. Amended by L.1973, H.B. No. 55, p. 452, § 1; L.1985, H.B. Nos. 96, 346 & 470, § 1, eff. May 31, 1985; L.1986, S.B. No. 685, § A, eff. May 1, 1986; L.1992, S.B. No. 705, § A; L.1994, H.B. No. 1165, § A, eff. July 6, 1994; L.1995, H.B. No. 409, § A; L.2000, S.B. No. 763, § A; L.2008, S.B. No. 788, § A.)

Notes of Decisions (180)

V. A. M. S. 407.020, MO ST 407.020

Statutes are current with emergency legislation approved through July 12, 2012, of the 2012 Second Regular Session of the 96th General Assembly. Constitution is current through the November 2, 2010 General Election.

End of Document                                                    © 2012 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B



# Hanging on for Pure Life

Why the Strategies
Behind Nestlé's New
Bottled Water Brand
May Be Good for the
Company but Bad for
Public Water

food&water watch





# About Food & Water Watch

Food & Water Watch works to ensure the food, water and fish we consume is safe, accessible and sustainable. So we can all enjoy and trust in what we eat and drink, we help people take charge of where their food comes from, keep clean, affordable, public tap water flowing freely to our homes, protect the environmental quality of oceans, force government to do its job protecting citizens, and educate about the importance of keeping shared resources under public control.

**Food & Water Watch**
1616 P St. NW, Suite 300
Washington, DC 20036
tel: (202) 683-2500
fax: (202) 683-2501
info@fwwatch.org
www.foodandwaterwatch.org

*California Office*
25 Stillman Street, Suite 200
San Francisco, CA 94107
tel: (415) 293-9900
fax: (415) 293-9908
info-ca@fwwatch.org



Copyright © March 2011 by Food & Water Watch. All rights reserved. This report can be viewed or downloaded at www.foodandwaterwatch.org.

# Hanging on for **Pure Life**

## Why the Strategies Behind Nestlé's New Bottled Water Brand May Be Good for the Company but Bad for Public Water

Executive Summary................................................................................................................iv

Introduction..........................................................................................................................1

    *Table 1: Change in sales, 2008-2009*.........................................................................1

Background: Troubled Times for Bottled Water......................................................................2

    *Table 2: Top 10 U.S. Bottled Water Brands in Wholesale Dollar Sales, 2009*......................2

    *Chart 1: Estimated Wholesale Sales for the U.S. Bottled Water Market, 1984-2009*..............2

    *Chart 2: Total Advertising Expenditures, 2004-2009*....................................................3

    *Chart 3: 2009 Advertising Expenditures*......................................................................3

A New Strategy: From Perrier to Pure Life............................................................................3

    *Chart 4: Nestlé Pure Life Sales, 2004-2009*................................................................4

Bottling Municipal Water: Profitable for Nestlé, Not for Public Water Systems.........................4

Selling Bottled Water as Healthy: Good for Nestlé's Image, Not the Tap's...............................6

Targeting New Markets Solves Nestlé's Sales Problems, Not the World Water Crisis....................8

    *Chart 5: Nestlé Waters Sales by Region, 2007-2010*....................................................9

    *Chart 6/Table 3: Change in Nestlé Waters Sales by Region Between 2007 and 2010*...........10

Conclusion: Hanging on for Pure Life..................................................................................10

Endnotes............................................................................................................................11



*Hanging on for Pure Life: Why the Strategies Behind Nestlé's New Bottled
Water Brand May Be Good for the Company but Bad for Public Water*

# Executive Summary

As many consumers in the United States and Europe are dropping bottled water, the industry is beginning to see a decline in sales. In fact, between 2007 and 2010, Nestlé Waters, the biggest water bottler in the world, saw its total sales drop 12.6 percent.

Today, Nestlé appears to have developed new strategies to combat this challenging sales climate, which center around its Pure Life brand. Unfortunately, while the brand has been profitable, these tactics do not bode well for public water in the United States or abroad.

The United States is the largest bottled water market in the world and has long been a major source of Nestlé's bottled water sales. The company's North American subsidiary is the biggest bottler in the United States. Today, the U.S. bottled water industry is seeing sales fall as many consumers and governments are choosing to drink tap water instead, citing concerns about the cost, energy, water use and plastic waste associated with bottled water. The CEO of Nestlé Waters North America has said that he is not concerned about tap water cutting into profits. Nevertheless, the company appears to be changing its tactics to keep its sales afloat.

Nestlé has shifted the focus of its advertising dollars in the United States to its new Pure Life brand. Between 2004 and 2009, spending on Pure Life advertising increased by more than 3000 percent; the company's nearly $9.7 million expenditure on the brand in 2009 was more than any other bottled water company spent on a leading domestic brand, and more than Nestlé's next five spring water brands combined.

Along with this change in expenditures came a shift in strategy. Pure Life differs from Nestlé's previous brands in the United States in terms of the source of its water, the messaging used to sell it, and its target audience. Pure Life bottles municipal tap water rather than spring water, which can help the company avoid the costly conflicts over water access and labeling that have plagued its spring water operations in the past, allowing it instead to vie with its main competitors, PepsiCo and Coca-Cola, on price. The company focuses its messaging on the health benefits of bottled water, especially compared to sugary soft drinks, which improves the image of its product and helps it appeal to parents and teachers who are concerned about their children's health. It also specifically targets Hispanic immigrants in the United States and "emerging markets" in developing nations abroad — consumers who are accustomed to inadequate water infrastructure and therefore less inclined to drink from the tap because of safety concerns.

In 2009, Nestlé's Pure Life brand helped the company outperform the rest of the U.S. bottled water industry. Between 2008 and 2009, Pure Life sales grew 18 percent while every other leading brand saw sales drop. While Nestlé's revenues went down with the rest of the industry in that time period, its 3.5 percent overall sales decline was less than that of the overall industry, which went down 5 percent. The Pure Life brand also played a role in increasing the total sales of Nestlé's global water division. Although Nestlé Waters' sales declined 3.4 percent in Europe and 1.1 percent in the United States and Canada between 2009 and 2010, total sales increased by 0.4 percent, due to the 24.6 percent growth in "other regions."

While these strategies appear to have helped boost Nestlé's profits, they have not been so beneficial for consumers or the environment. No matter the source, when there is safe tap water available, bottled water comes with unnecessary costs to the consumer as well as environmental damage from the associated energy, water use and plastic waste. In addition, Nestlé's new Pure Life strategies could be especially worrisome when it comes to their potential impact on public water.

Food & Water Watch 

Nestlé's shift to bottling municipal water in the United States has led an industry trend in shifting from spring water to municipal water. Between 2005 and 2009, the overall volume of tap water bottled by the industry grew by 66 percent while the volume of spring water increased by only 9 percent, which means that tap water bottling expanded at more than seven times the rate of spring water bottling. Today, many public water systems are inadequately funded and facing potential water shortages; allowing a corporation to bottle and sell community water can be a raw deal for the municipality. Bottling municipal water instead of spring water does not do away with the environmental concerns, which is why residents in Sacramento, for one, opposed a new Pure Life facility that would draw on their city tap water.

In addition, selling bottled water as healthy, especially to children, distracts consumers from another option that is also healthy — the tap. Promoting the mindset that bottled water is a good source of healthy water undermines public confidence in tap water, which is especially dangerous today as our disappearing public drinking water sources need political support and funding.

While Nestlé's global water division's sales are falling in Europe, the United States and Canada, they are growing rapidly in the "emerging markets" that Nestlé is targeting in the rest of the word. In 2010, Nestlé's sales of bottled water in these "other regions" increased by 25 percent over its 2009 sales in these areas. This is problematic because specifically selling bottled water to populations around the world that do not have access to safe drinking water capitalizes on the world water crisis. While this may be profitable for Nestlé, it does not provide a long-term solution for the billions of people abroad who lack access to adequate water and sanitation. In fact, the company will likely sell bottled water to the customers abroad who can afford it, not those who are in most dire need of better water supplies.

Just as consumers in the United States are better served by properly maintained public water infrastructure than bottled water sales, the water needs of populations abroad cannot be addressed without recognizing that access to water is affected by governance. To address the world water crisis, the global community must treat access to water as a basic human right, not a source of profits.

In the United States, it is important to support public drinking water rather than bottled water — no matter how cleverly the product is advertised. That is why Food & Water Watch is working to promote federal funding for drinking water infrastructure and water programs that will keep our public water clean and safe for future generations.

*Water links us to our neighbor in a way more profound and complex than any other.*

*– John Thorson*



## Introduction

Between 2008 and 2009, only one leading bottled water brand in the United States posted an increase in sales: Nestlé Pure Life.[1] The brand's 18 percent growth was a huge outlier in a year where every single other leading brand saw sales decline, and overall industry sales dropped 5 percent (see Table 1).[2]

| Table 1: Change in sales, 2008-2009 | |
|---|---|
| **Brands** | **2008/09** |
| Aquafina | -10.00% |
| Dasani | -7.90% |
| Poland Spring | -6.40% |
| **Nestlé Pure Life** | **18.00%** |
| Arrowhead | -11.90% |
| Crystal Geyser | -10.40% |
| Deer Park | -5.60% |
| Ozarka | -8.40% |
| Ice Mountain | -5.70% |
| Zephyrhills | -10.90% |
| **Percent drop for the 10 leading brands** | **-6.20%** |
| All Others | -3.80% |
| **Percent drop for entire industry** | **-5.20%** |

Source: Beverage Marketing Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010 at 150.

Pure Life is the newest of Nestlé Waters North America's top brands.[3] Nestlé Waters North America is the U.S.-based subsidiary of Nestlé, a multinational corporation based in Switzerland.[4] In 2009, the company owned a larger portion of the U.S. market than any other company. It was responsible for 35.4 percent of total industry sales,[5] owned seven out of the 10 leading brands in the United States, including Pure Life, and brought in revenues worth $3.8 billion.[6] (See Table 2.) Although its sales went down in 2009, along with the other leading companies, Nestlé Waters North America's 3.5 percent decline[7] outperformed the rest of the industry.

The Beverage Marketing Corporation attributes Nestlé's relative success to its competitive advantage and its skillful marketing.[8] These traits appear to have contributed to the success of Pure Life, which differs from Nestlé's previous brands in the source of its water, the messaging the company is using to sell it, and the target audience for its advertising

Unfortunately, while the tactics that the company is using to sell Pure Life may be boosting Nestlé's bottom line, they may not bode so well for the future of public water.



*Hanging on for Pure Life: Why the Strategies Behind Nestlé's New Bottled Water Brand May Be Good for the Company but Bad for Public Water*

## Background: Troubled Times for Bottled Water

Nestlé's change in tactics with its new Pure Life brand has likely been influenced by the new challenging sales climate for bottled water. Starting in 2008, the multi-billion dollar industry saw sales decline for two years in a row, a trend that the Beverage Marketing Corporation attributes to a bad overall economy and a "growing eco-consciousness."[9]

This recent downturn is an anomaly for a product that industry analysts describe as "one of the great success stories in the history of the beverage industry,"[10] a product that has "transitioned from its precocious youth to energetic adulthood" and now has a "firmly entrenched position in the U.S. marketplace."[11] In the 25 years between 1984 and 2009, total estimated wholesale dollars increased tenfold — from 1 billion to more than 10 billion dollars[12] (see Chart 1), making it the second-best-selling beverage category, next to carbonated soft drinks.[13]



**Chart 1: Estimated Wholesale Sales for the U.S. Bottled Water Market, in Billions of Dollars, 1994-2009**

Source: Beverage Marketing Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010 at 20.

A large portion of the change in outlook appears to be due to a growing consumer awareness of the social and environmental concerns associated with the product. The bottled water industry uses water, consumes energy and creates mountains of plastic waste as a result of the production and transport of its product. Researchers at the Pacific Institute found that in 2006, the industry used three liters of water to produce each liter of bottled water, and that in 2007, the U.S. bottled water industry consumed the energy equivalent of between 32 and 54 million barrels of oil.[14] They also calculated that bottled water production can take up to 2,000 times as much energy as tap water if the plastic production, water extraction, bottling and transportation costs are all factored in.[15] In addition, the Government Accountability Office reported that in 2006, about three-quarters of plastic water bottles were not recycled.[16] At this rate, millions of tons of empty plastic bottles end up in landfills, where they may never decompose. Meanwhile, for many cash-strapped consumers and governments, it makes more sense to drink tap water, which costs between $0.002 and $0.003 per gallon, rather than the typical bottled water brands, which cost hundreds to thousands of times that amount, while being less environmentally friendly.[17]

As consumer and environmental organizations, along with the media, have publicized these issues, many consumers and governments are cutting down on bottled water, and industry sales are declining.

**Table 2: Top 10 U.S. Bottled Water Brands in Wholesale Dollar Sales, 2009**

|  | Brand | Parent Company | Total Sales (in millions) |
|---|---|---|---|
| 1 | Aquafina | PepsiCo | $1,176.9 |
| 2 | Dasani | Coca-Cola | $1,156.9 |
| 3 | Poland Spring | Nestlé Waters North America | $830.4 |
| 4 | Nestlé Pure Life | Nestlé Waters North America | $698.8 |
| 5 | Arrowhead | Nestlé Waters North America | $478.9 |
| 6 | Crystal Geyser | Crystal Geyser Roxane | $475.4 |
| 7 | Deer Park | Nestlé Waters North America | $456.8 |
| 8 | Ozarka | Nestlé Waters North America | $319.8 |
| 9 | Ice Mountain | Nestlé Waters North America | $261.6 |
| 10 | Zephyrhills | Nestlé Waters North America | $225.8 |

Source: Beverage Marketing Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010 at 150.

Food & Water Watch food&waterwatch

As the tides are turning for bottled water, some companies appear to be losing interest in the product. For example, the Beverage Marketing Corporation notes that the major bottlers have "turned off the spigot" of advertising dollars in recent years.[18] The $0.004 per gallon that the overall industry spent on advertising in 2009 was a "31-year low."[19] PepsiCo spent 500 times less on Aquafina in 2005 than it did in 2009, as its advertising expenditures went down from $25.6 million to $50,500.[20] Coca-Cola's $3.1 million budget for advertising Dasani in 2009 was a "far cry from its peak," which was in 2001, at $26.4 million.[21] Even Nestlé "slashed ad spending on its major brands in 2008," although in 2009, it "spent more on some brands and less on others."[22] In 2010, the Wall Street Journal reported that Danone, a multinational corporation in France that owns some of the world's leading brands, including Evian, was talking about selling its water division to a Japanese company.[23]

But Nestlé Waters North America appears to have no intention of letting up entirely. In his 2009 presentation on the future of bottled water, Nestlé CEO Kim Jeffery said that the company is "bullish" on bottled water.[24] Further, the Beverage Marketing Corporation reports that Jeffery "is not outwardly concerned about the threat from tap water."[25]

Yet while Nestlé remains publicly optimistic, the company does appear to be changing its strategies in response to the consumer backlash — shifts that are most evident in its new focus on Pure Life.



**Chart 3: 2009 Advertising Expenditures, in Millions of Dollars**

Source: Beverage Marketing Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010 at 270.

## A New Strategy: From Perrier to Pure Life

Pure Life is a new brand for the leading bottler in the United States. The Swiss food and beverage giant first tapped into the U.S. bottled water market with its Perrier brand in the late 1970s.[26] The expensive sparkling water from France appealed to some consumers as a status symbol.[27]

Since then, Nestlé acquired spring water brands around the country that extracted water from some of the most ecologically sensitive water sources in the United States,[28] which the company's own marketing suggests are also some of the most pristine. Today, six out of its seven leading brands are regional spring water brands: Poland Spring, from Maine; Arrowhead, from California, Arizona and Nevada; Deer Park, sold from New York to Florida; Ozarka, from the Southwest; Ice Mountain in the Midwest; and Zephyrhills, in Florida.[29]

In contrast, Pure Life is available on a national scale.[30] It was actually the company's first "multi-site" bottled water product, introduced in Pakistan in 1998.[31] It came to the United States in 2002, when Nestlé announced that it would change its recently acquired Aberfoyle Springs into Nestlé Pure Life.[32]

Today, the company is focusing the bulk of its advertising energy on Pure Life rather than its regional spring water



**Chart 2: Total Advertising Expenditures, in Millions of Dollars, 2004-2009**

Source: FWW calculation based on data from Beverage Marketing Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010 at 270.



brands. The company increased expenditures on advertising for Pure Life by 3,000 percent between 2004 and 2009, from $309,200 to nearly $9.7 million.[33] In that time period, it spent more than twice as much on advertising for Pure Life than its leading spring water brand, Poland Spring.[34] (See Chart 2.) In fact, in 2009, Nestlé spent far more money advertising Pure Life than any company spent on any other leading bottled water brand.[35] The amount it spent on Pure Life was four times as much as it spent on Arrowhead — its next-highest brand in advertising dollars spent — and more than it spent on the next five of its leading spring water brands combined.[36] (See Chart 3.)

This shift in expenditures appears to have paid off, as Pure Life has seen exceptional growth. Since 2004, Nestlé Pure Life sales have increased 320 percent, from 166.4 million to 698.8 million in wholesale dollar sales.[37](See Chart 4.) But it wasn't just the amount of money the company spent advertising the product that changed. With Pure Life, Nestlé also changed the source of its water, the messaging the company is using to sell it, and the target audience for its advertising.

These shifts are strategic because they allow the company to avoid some of the factors that have made selling bottled water more difficult in recent years. Unfortunately, these new strategies do not address consumer concerns about the environmental impacts of the product — and, in fact, present new problems for public water.



Members of the Portland State University Environmental Club encourage other students to drink tap water instead of bottled water. Photo courtesy Lisa Meersman.



**Chart 4: Nestlé Pure Life Sales, in Millions of Dollars, 2004-2009**

Source: Beverage Marketing Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010 at 223.

## Bottling Municipal Water: Profitable for Nestlé, Not for Public Water Systems

Although Pure Life began as a spring water brand when it first came to the United States, the company began its shift to bottling municipal water in 2005.[38] Today, Nestlé's shift in source water has played a large role in the whole industry trend towards bottling municipal water. Between 2005 and 2009, the overall volume of tap water bottled by the industry grew by 66 percent while the volume of spring water increased by only 9 percent, which means that tap water bottling expanded at more than seven times the rate of spring water bottling.[39] In the past five years, municipal water's share of the market has increased 14.3 percent—from one third to nearly half of the total volume sold.[40] The Beverage Marketing Corporation attributes much of this trend to the shift in source of Pure Life.[41]

According to the Beverage Marketing Corporation, "conventional wisdom in the bottled water industry is that the majority (but by no means all) of bottled water consumers do not recognize the distinction between spring water and drinking water packaged after it has been processed in municipal systems."[42] If changing the source water does not significantly affect sales, bottling municipal water is a strategic move for the company because it can help Nestlé avoid the costly conflicts with communities that have plagued its spring water operations in the past.

Spring water bottling sucks up large quantities of water from local sources, often near environmentally sensitive

**Food & Water Watch** 

sources of water.[43] This can deplete surrounding waterways if water from the ground is pulled out faster than it is naturally replenished.[44] Often, residents near proposed plants oppose spring water operations because of concerns about the long-term safety of their water supply, as well as issues such as noise and wear on local infrastructure.[45] The *Beverage Marketing Corporation* notes that residents also express concerns that "the company takes too much of a finite resource (water) without paying adequate compensation."[46] Nestlé has attracted negative press or paid for expensive lawsuits because of such conflicts in Michigan, Massachusetts, Colorado, Texas, Maine, Florida, California and Oregon.[47]

Today, the company is finding it more difficult to find new sources of spring water because local groups are increasingly organized and vocal in their opposition to new plants. Despite the vast financial resources that Nestlé has at its disposal, it abandoned its attempt to bottle water from McCloud, California, after loud citizen outcry, and is facing strong resistance to its planned plant in Cascade Locks, Oregon.[48]

If most consumers do not care where their water comes from, bottling spring water may not be worth the bad publicity. Already, the top two leading brands in the country, PepsiCo's Aquafina and Coca-Cola's Dasani, draw from municipal sources.[49] Although the brands have received negative press for bottling tap water, many consumers do not appear to be bothered by it. Even with their respective 10 percent and 8 percent drops in sales in 2009, both brands still brought in more than a billion dollars in sales each.[50]

In fact, the *Beverage Marketing Corporation* notes that most customers appear to have very little brand loyalty, and instead are more concerned about the price.[51] It says that the bottled water market is "increasingly price-sensitive" and that "price wars in the bottled water sector have been prevalent in the last decade and a half."[52]

This is where Nestlé has an advantage as a "low-cost producer" — it has a large parent company, so it can take risks other companies can't, and it produces its own bottles, which keeps costs down.[53] A large portion of the success of Pure Life appears to be due to its low price. The new brand is cheaper than its leading rivals, which helped the company make deals with large suppliers such as Burger King and Walmart that had previously gone to Aquafina or Dasani.[54]

While bottling municipal water appears to have been a good move for the company, it's not such a great deal for the public. While the *Beverage Marketing Corporation* puts a positive spin on the product by describing

municipal water bottlers as "intermediaries" between municipal water systems and consumers,[55] this ignores the fact that pipes can also serve as "intermediaries" that bring the water straight to households at a lower cost to the consumer.

Unfortunately, many municipal water systems in the United States today are woefully underfunded, in need of maintenance and repair, and facing water shortages. When bottlers take water out of a municipal system, they are profiting from a community resource that is funded by taxpayer dollars. They may even pay less for the water than other users. For example, in January 2011, when the city of Pasadena, Texas, agreed to allow Nestlé's new Pure Life bottling plant in its city limits, it offered the company a 50 percent discount on the city's water — and still said it was giving the company a tougher deal than most municipalities would have offered.[56]

> *The Beverage Marketing Corporation describes municipal water bottlers as "intermediaries" between water systems and consumers, but pipes also serve as "intermediaries" that bring the water straight to households at a lower cost to the consumer.*

A perfect example of Nestlé's shift in strategy occurred recently in northern California. The company had planned to bottle spring water from the rural town of McCloud, but faced six years of resistance from residents concerned about the effects a bottling plant would have on their local ecosystems and quality of life.[57] Instead of pursuing the McCloud facility, Nestlé announced in 2009 that it would use an existing facility to bottle municipal water in the more populous state capital of Sacramento instead.[58] The plant planned to use 30 million gallons of the city's tap water in 2010, along with additional water from private springs, to bottle water under the Pure Life and Arrowhead brands.[59] When the CEO of Nestlé Waters North America wrote to the residents of McCloud announcing that the



company was withdrawing its plans to build a plant there, he said that "Sacramento plant production will replace the production we expected in McCloud."[60] Seeing this, a group of concerned local residents formed the group Save Our Water Sacramento to oppose the plant and seek a stop to bottling plants in the city.[61] As a leader of Save Our Water Sacramento stated regarding the switch from bottling water in McCloud to bottling it in Sacramento, "It's not like those environmental issues disappear."[62]

## Selling Bottled Water as Healthy: Good for Nestlé's Image, Not the Tap's

Along with the change in source water, Nestlé has changed its messaging approach from promoting the "pure" source of the water to the health benefits. This move is strategic for the company because it can help avoid criticism over the accuracy of its labeling, broaden the appeal of the product, and create a new, more positive overall image for Nestlé's bottled water by associating itself with healthy kids and the anti-obesity movement. Unfortunately, promoting bottled water in this way undermines consumer support for a healthy source of drinking water that is also more cost-effective and environmentally friendly: the tap.





In the past, Nestlé's major brands focused their advertising on the quality of the water that comes from a specific location. Poland Spring, its label depicting a river flowing between rows of pine trees, says that it "Just may be the best tasting water on earth;" Arrowhead is "mountain spring water"; Deer Park uses the line, "That's good water!" Ozarka, from the Southwest, says it is "Straight from nature to you!" Ice Mountain claims to be "Pure as the Driven Snow!" And Zephyrhills, in Florida, bills itself as "Pure water from a pure place."[63] Most recently, the company launched a "Born Better" campaign, "to help consumers learn about what makes Nestlé Waters' regional spring brands so unique."[64]

In contrast, Pure Life's messaging focuses on what you do with the product rather than where it came from. Its slogan is "Satisfying your thirst for life."[65] Instead of mountains and rivers, its label depicts people holding their hands in the air.[66] And, rather than advertising the area it comes from, its web page says that it is an essential part of a healthy lifestyle.[67]

Since water is clearly healthy, this new message is not likely to be disputed as inaccurate — unlike some of the company's previous messages, which have come under fire as its spring water operations have attracted public scrutiny. For example, Nestlé's Poland Spring brand was hit with several class-action lawsuits around the country accusing the brand of false advertising because of the alleged disconnect between the labeling and the way the actual bottling operations work.[68] The company admitted no wrongdoing, but in one suit, the judge approved a settlement in which Nestlé would give plaintiffs $8 million in coupons and donate $2.75 million to charities.[69]

While Nestlé did not lose the case in court, many consumers have become skeptical of its claims. Moreover, as it is becoming more difficult to find new sources of spring water, it may be more difficult to defend spring water labels. Already, as the company continues its quest to bottle more water, many of its operations are moving farther away from the original sources described on their labels. Poland Spring is no longer getting its water just from its original site; it now has three plants in Maine, after adding one in Hollis and one in Kingfield.[70] It draws from additional sources around the state, including Fryeburg, Poland, Dallas Plantation, Pierce Pond Township and St. Albans.[71] Similarly, the Deer Park brand has moved away from its origins. The company said in 2001 that it was closing down its Deer Park plant in Deer Park, Maryland, and going instead to Allentown, Pennsylvania; it also draws water from Florida.[72] Selling bottled municipal water without emphasizing where it came from can help the

Food & Water Watch 



company avoid criticism down the road that these sources are not true to their labels.

Changing the message to focus on health rather than location also enables the company to reach a broader audience with a single product. Since the messaging does not specify a particular location, it can appeal to a national, rather than a regional audience. The company appears to be employing this new strategy with its new spring water brand, Re-source, as well, which says that it is spring water but does not advertise the specific location the spring water comes from.[73]

In addition, switching its message may help Nestlé improve its overall corporate image. In the past, the company has attempted to paint itself as more environmentally friendly by making lighter packaging, supporting recycling programs and making donations to water-related charities.[74] These types of messages have been criticized as "greenwashing" — or "bluewashing" when it comes to water — making environmentally friendly claims that contradict or distract from the true impacts of a product.[75]

By switching to a health message, the company may distract consumers from these critiques and associate itself instead with a much less objectionable subject — healthy kids. Today, as many parents and teachers are worried about obesity affecting children, they are looking for alternatives to soda and other sugary beverages. According to Beverage World, an industry publication, many of Pure Life's television commercials are designed to convince consumers that drinking water is better than drinking soda.[76]

Pure Life is capitalizing on this trend by bringing its health message specifically to schools. Its Go Play! program gave children the opportunity to redeem Pure Life labels to earn points for their schools that could be redeemed as funds for recreational programming.[77] The Beverage Marketing Corporation reports that in 2009 the company said Pure Life is now present in a quarter of American school cafeterias.[78]

Unfortunately, while these changes in messaging may improve Nestlé's image, they promote a consumer mindset that is damaging to the future of public water. By advertising bottled water as healthy, the company is encouraging consumers to overlook the tap, even though it is also healthy. For example, one study conducted in Germany found that encouraging children to drink from school water fountains prevented obesity.[79] In addition, removing any mention of the source of the water means that the packaging does not even give the consumer a reminder

*Hanging on for Pure Life: Why the Strategies Behind Nestlé's New Bottled
Water Brand May Be Good for the Company but Bad for Public Water*

food&waterwatch



## Targeting New Markets Solves Nestlé's Sales Problems, Not the World Water Crisis

Nestlé is also shifting the target of its marketing from its traditional customer base in the United States and Europe to Hispanic immigrants in the United States and "emerging markets" in the rest of the world. This is a strategic move because it targets populations that have not had access to safe tap water — but it won't solve the world water problems that make the product seem like a good option in the first place.

In the past, most of the company's bottled water revenues have come from markets in Europe and North America that are now less receptive to the product.[82] In the United States, Nestlé's first bottled water product, Perrier, gained popularity as a status symbol among many urban middle-class consumers who were willing to pay the higher cost. Now, bottled water is ubiquitous, and many American consumers see tap water as a better alternative. Similar trends have occurred in Europe.

But not everyone in the world has the option to drink safe tap water. According to the World Health Organization, 1.1 billion people worldwide lack access to an "improved drinking water source" and 2.6 billion lack sanitation facilities.[83] The United Nations says that "urgent action is needed if we are to avoid a global water crisis."[84] As one food and drink consulting company put it, "In the western world, we take tap water availability and quality for granted. In other markets, bottled water is much more of a vital lifeline."[85]

Nestlé is specifically targeting these "emerging markets" with its bottled water. Today, the water division of the global corporation has plants in 37 countries, "wants to enter 5 more" and is "aiming to expand its proportion of sales from emerging markets to a third of revenue within a decade."[86] It has its eyes set on China, Brazil, the Middle East and Pakistan, and hopes to "further accelerate the growth of its Pure Life brand" in emerging markets.[87] Today, Pure Life specifically is sold in Algeria, Argentina, Brazil, China, Egypt, Indonesia, Iran, Jordan, Lebanon, Mexico, Nigeria, Pakistan, Russia, Saudi Arabia, South Africa, Thailand, Turkey, the United Arab Emirates and Uzbekistan, as well as Canada, the United Kingdom and the United States.[88]

Targeting new markets appears to be bringing the company some level of success. Although Nestlé Waters saw total sales decline 12.6 percent between 2007 and 2010, the company began to see positive overall growth due to

that water is a finite natural resource that should be used responsibly. These sorts of messages are especially worrisome when they are targeted towards children, some of the most impressionable consumers.

As bottled water has become more mainstream, consumers are becoming more accustomed to buying water in plastic packaging rather than drinking it from a tap or a fountain. The increased availability of bottled water and dwindling or run-down sources of public drinking water only reinforce this shift in mindset. For example, a stadium at the University of Central Florida was built without water fountains during a brief time when the Florida building code allowed the sale of bottled water to substitute for fountains. The bottled water ran out during the stadium's opening in 2007, resulting in dehydrated and sick fans.[80] Similarly, bottled water is now one of the most commonly sold products in schools, while many school drinking fountains around the country are falling into disrepair.[81]

Increasingly, bottled water is becoming available where public water is not. Many of these decisions are made because selling bottled water generates a profit, while providing public water does not, even though it is an extremely valuable service. If consumers are influenced by Nestlé's advertising to believe that bottled water is a good source of healthy water, they are likely to become less inclined to advocate for changes in policy and funding that are necessary to keep public water safe and affordable.



Food & Water Watch

sales growth in emerging markets in 2010.[89] For example, in 2008, while Nestlé's global water division saw negative growth overall, its emerging markets businesses grew more than 20 percent.[90] One Swiss publication dubbed Pure Life "The Perrier for the Poor."[91] It is now the best-selling water brand in the world.[92] These Pure Life sales were probably a major reason why, by the end of 2010, Nestlé Waters' 2010 Annual Report indicated that, while the company's sales in Europe, the United States and Canada had declined again, the company's sales in "other regions" grew dramatically.[93] (See Chart 5.) Nestlé's sales in these other regions were 25 percent larger in 2010 than they were in 2009.[94] This growth offset the declines in Europe, the United States and Canada enough that Nestle Waters saw a slight (0.4 percent) increase in overall sales.[95]

Even in the United States, Nestlé is now targeting populations that are more likely to see bottled water as a good alternative to the tap because they come from countries where tap water is often not safe to drink. In 2008, the advertising magazine Brandweek reported that Pure Life's target audience is "recent U.S. Hispanic immigrants, moms in particular, who are un-acculturated to American products, yet have an affinity for the Nestlé name."[96] The company teamed up with Cristina Saralegui, a celebrity who has been referred to as the "Spanish Oprah"[97] for a series of television commercials. Overall, it spent $19 million on Hispanic network television and cable ads in 2006, which went up to $30 million in 2007. The company has also opened an entire store in New York City to appeal to this audience, which it calls Pure Life Mercado del Agua (water store).[98] Ironically, the Pure Life Mercado del Agua is located in the Bronx, one of the lowest-income areas of New York City — a city whose tap water has been touted as some of the best in the world.[99] This means that the store is specifically selling to a population that may be least likely to afford bottled water, even though there is a much cheaper water option available.

Unfortunately, while selling bottled water abroad may be a good way to find new customers for Nestlé, it is not going to solve the world water crisis. Nestlé's global headquarters is targeting the billion customers that it estimates "will be able to increase their incomes enough to afford Nestlé products."[100] It seems unlikely that the company will sell bottled water at a reduced price to the people who cannot afford to buy it. Unfortunately, the world's citizens who most need water are the ones least likely to afford bottled water.

Just as consumers in the United States are best served by functioning tap water, populations around the world need safe public water. The Second United Nations Water



**Chart 5: Nestlé Waters Sales by Region, in Billions of Swiss Francs, 2007-2010**

Source: Nestlé Annual Report, 2010 at 39 and Nestlé, Annual Report, 2009 at 29.



Nestlé's Mercado del Agua, or Water Market, in the Bronx, specifically advertising the Pure Life brand. Photos by Food & Water Watch.



*Hanging on for Pure Life: Why the Strategies Behind Nestlé's New Bottled Water Brand May Be Good for the Company but Bad for Public Water*

## Chart 6/Table 3: Percentage Change in Nestlé Waters Sales by Region, Between 2007 and 2010



| Europe | -20.1% |
|---|---|
| United States and Canada | -14.2% |
| Other regions | 44.8% |
| Total sales | -12.6% |

Source: FWW Calculation based on data from Nestlé. Annual Report. 2010 at 39 and Nestlé. Annual Report. 2009 at 29.

Development Report says that the water crisis is created by a crisis of governance — who has control over it and how it is managed.[101] Buying bottled water does not address this issue. In fact, water bottlers have financial incentive not to address these challenges — if water is scarce, they can charge a premium for their product. Even in the United States, the potential deterioration of water infrastructure can be seen as a profit opportunity for bottled water. In his 2009 presentation about the future of bottled water, Nestlé CEO Kim Jeffrey said that the company believes that "tap water infrastructure in the United States will continue to decline" and that "people will turn to filtration and bottled water for pure water needs."[102]

While bottled water can be a temporary solution for obtaining clean water on an individual basis, it does not address the broader need to sustainably manage water resources in the United States or abroad, and it does not provide access to water for the billions of people around the world who can least afford it. To achieve this goal, the global community must recognize that water should not be treated as a source of profits, but rather as a basic human right.

## Conclusion: Hanging on for Pure Life

A major part of Nestlé's success in the U.S. bottled water industry relative to its competition in 2009 was the increased sales of its new Pure Life brand. This may be good for the company's bottom line, but it doesn't bode well for the future of public water if American consumers continue to buy bottled water when they could be drinking tap water — the most cost-effective, environmentally friendly source of water there is.

No matter how clever a company's marketing campaign, consumers are better served by properly maintained tap water than by buying individually packaged bottles of water. Today, as many tap water systems in the United States are in need of maintenance and repair, it is important to ensure that this important public resource is adequately funded. That is why Food & Water Watch is working to renew America's water through increased federal funding for drinking water programs and infrastructure.

Food & Water Watch



## Endnotes

1    Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 150.
2    Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 150, 3.
3    See Nestlé website, www.Nestlé-watersna.com/menu/ourbrands.
     htm accessed January 29, 2011.
4    Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 152; Nestlé. Annual Report. 2009 at 2.
5    Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 152.
6    Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 150, 152.
7    Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 152.
8    Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 153.
9    Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 7, 22.
10   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 2.
11   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 2.
12   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 20.
13   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 2, 4.
14   Pacific Institute. "Bottled Water and Energy: A Factsheet." 2007;
     Gleick, PH and HS Cooley. "Energy implications of bottled wa-
     ter." Environmental Research Letters, 4, 014009. 2009 at 6.
15   Gleick, PH and HS Cooley. "Energy implications of bottled wa-
     ter." Environmental Research Letters, 4, 014009. 2009 at 6.
16   U.S. Government Accountability Office. "Bottled Water: FDA
     Safety and Consumer Protections are Often Less Stringent than
     Comparable EPA Protections for Tap Water." June 2009 at 23.
17   Office of Water. U.S. Environmental Protection Agency. "Water
     on Tap: what you need to know." (EPA 816-K-03-007). October
     2003; NUS Consulting Group. "2007-2008 International Water
     Report & Cost Survey." July 2008; Food & Water Watch pur-
     chased five single-serve bottles of water in August/September
     2009 from a Washington, D.C. 7-Eleven, CVS Pharmacy, Giant,
     Safeway and Whole Foods Market. The cost, excluding sales tax,
     totaled $5.77 for 97.4 ounces, which works out to $7.58 per
     gallon.
18   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 262.
19   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 259.
20   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 262.
21   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 262.
22   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 263.
23   Vidalon, Dominique and Soyoung Kim. "Danone in talks to
     sell bottled water unit: report." Reuters. November 9, 2010.
     Cimilluca, Dana and Anupreeta Das. "Can Danone slake
     Japanese thirst!" The Wall Street Journal. November 10, 2010.
24   Jeffery, Kim. [Powerpoint] "The Future of Bottled Water."
     September 18, 2009 at 15.
25   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 155.
26   Moskin, Julia. "Must be something in the water." The New York
     Times. February 15, 2006.
27   Davies, Jennifer. "Business in a bottle." San Diego Union Tribune.
     January 16, 2005.
28   Hyndman, David. Associate Professor, Michigan State University.
     Testimony on "Assessing the Environmental Risks of the Water

     Bottling Industry's Extraction of Groundwater". Subcommittee
     on Domestic Policy. Committee on Oversight and Government
     Reform. December 12, 2007 at 3.
29   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 150; See Nestlé website, www.Nestlé-
     watersna.com/menu/ourbrands.htm accessed January 29, 2011.
30   Nestlé website. Nestlé Pure Life. Available at www.Nestlé-
     watersna.com/Menu/OurBrands/NPL.htm. Accessed January 29,
     2011.
31   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 165; Nestlé Waters. [Brochure].
     "Nestlé Waters 2010: 2009 facts and figures." 2010.
32   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 165.
33   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 270.
34   FWW calculation based on data from Beverage Marketing
     Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010
     at 262.
35   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 262.
36   FWW calculation based on data from Beverage Marketing
     Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010
     at 262.
37   FWW calculation based on data from Beverage Marketing
     Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010
     at 223.
38   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 254.
39   FWW analysis of Beverage Marketing Corporation. "Bottled
     Water in the U.S." 2010 Edition. July 2010 at 255.
40   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 254, 255.
41   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 254.
42   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 253.
43   Hyndman, David. Associate Professor, Michigan State University.
     Testimony on "Assessing the Environmental Risks of the Water
     Bottling Industry's Extraction of Groundwater". Subcommittee
     on Domestic Policy. Committee on Oversight and Government
     Reform. December 12, 2007.
44   Alley, William et al. U.S. Department of the Interior. U.S.
     Geological Survey. "Sustainability of Ground-Water Resources."
     (Circular 1186). 1999 at 22, 30-35.
45   See Food & Water Watch. "All Bottled Up: Nestlé's Pursuit of
     Community Water." January 2009.
46   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 9.
47   See Food & Water Watch. "All Bottled Up: Nestlé's Pursuit of
     Community Water." January 2009.
48   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 162.
49   Geller, Martinne. "Aquafina labels to spell out source – tap wa-
     ter." Reuters. July 26, 2007.
50   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 150.
51   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 12.
52   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 12.
53   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 153.
54   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 166, 13.
55   Beverage Marketing Corporation. "Bottled Water in the U.S."
     2010 Edition. July 2010 at 253.
56   Dawson, Jennifer. "Nestlé bottles up location for $13M Pasadena
     plant." Houston Business Journal. January 7, 2011.

food&waterwatch

*Hanging on for Pure Life: Why the Strategies Behind Nestlé's New Bottled
Water Brand May Be Good for the Company but Bad for Public Water*

57  McCloud Watershed Council. "Nestlé Project in McCloud." [website] Available at http://www.mccloudwatershedcouncil.org/nestle-project. Accessed March 12, 2011; ECONorthwest. "The Potential Economic Impacts of the Proposed Water Bottling Facility in McCloud." Prepared for McCloud Watershed Council, October 2007.

58  Hurt, Suzanne. "Discussion grows over Nestlé water bottling plant." *Sacramento Press.* October 25, 2009.

59  Hurt, Suzanne. "Discussion grows over Nestlé water bottling plant." *Sacramento Press.* October 25, 2009; Johnson, Kelly. "Nestlé Waters to set up plant in Sacramento warehouse." July 24, 2009.

60  Nestlé Waters North America. [Press Release] "Nestlé Waters North America Withdraws McCloud Project Proposal." September 10, 2009.

61  Hurt, Suzanne. "Discussion grows over Nestlé water bottling plant." *Sacramento Press.* October 25, 2009.

62  Hurt, Suzanne. "Discussion grows over Nestlé water bottling plant." *Sacramento Press.* October 25, 2009.

63  *See* Nestlé website. www.Nestlé-watersna.com/menu/ourbrands.htm accessed January 29, 2011.

64  Nestlé Waters North America. [Press Release] "Nestlé Waters North America Launches 'Born Better' Campaign to Help Consumers Learn About What Makes Nestlé Waters' Regional Spring Water Brands So Unique." November 10, 2009.

65  Nestlé website. Nestlé Pure Life. Available at www.Nestlé-watersna.com/Menu/OurBrands/NPL.htm. Accessed January 29, 2011.

66  Nestlé website. Nestlé Pure Life. Available at www.Nestlé-watersna.com/Menu/OurBrands/NPL.htm. Accessed January 29, 2011.

67  Nestlé website. Nestlé Pure Life; Nestlé Pure Life Sources. Available at www.Nestlé-watersna.com/Menu/OurBrands/NPL.htm. Accessed January 29, 2011.

68  Beverage Marketing Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010 at 160.

69  Beverage Marketing Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010 at 160.

70  Beverage Marketing Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010 at 158.

71  Beverage Marketing Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010 at 158.

72  Beverage Marketing Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010 at 163.

73  Beverage Marketing Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010 at 170.

74  Food & Water Watch. "Bluewashing: Why The Bottled Water Industry's Ecofriendly Claims Don't Hold Water." March 22, 2010.

75  Food & Water Watch. "Bluewashing: Why The Bottled Water Industry's Ecofriendly Claims Don't Hold Water." March 22, 2010.

76  "As Water Sales Dry Up, Nestlé Pans Soda." *Beverage World.* November 13, 2008.

77  Nestlé Waters North America. "Nestlé Pure Life Go Play! Fact Sheet." 2007.

78  Beverage Marketing Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010 at 166.

79  Muckelbauer, Rebecca et al. "Promotion and Provision of Drinking Water in Schools for Overweight Prevention: Randomized, Controlled Cluster Trial." *Pediatrics.* Vol. 123. iss. 4. 2009.

80  *See* Food & Water Watch. "How Your Organization Can Promote Tap Water." May 2010 at 2; "UCF Says No Water Fountains For You." Wesh TV/DT, Orlando, Florida, September 14, 2007. Accessed on July 17, 2009;      "UCF To Install Water Fountains In New Stadium." Wesh TV/DT. Orlando, Florida, September 18, 2007. Accessed on July 27, 2009

81  *See* Food & Water Watch. "Teaching the Tap: Why America's Schools Need Funding for Water." Burke, Garance. "School drinking water contains toxins." Associated Press. September 25, 2009. Accessed April 29, 2010. Centers for Disease Control and Prevention. "Competitive Foods and Beverages Available for Purchase in Secondary Schools ---Selected Sites, United States, 2006." *Morbidity and Mortality Weekly Report.* Vol. 57 iss. 34. August 29, 2008.

82  Nestlé. [Press release]. "Excellent first half for Nestlé in 2008: 8.9% organic growth, 3.5% real internal growth – EBIT margin in constant currencies +60 basis points, +30 basis points reported." August 7, 2008.

83  World Health Organization and UNICEF. Joint Monitoring Programme for Water Supply and Sanitation. "Water for Life: Making it Happen." 2005.

84  United Nations World Water Assessment Programme. "Water in a Changing World." 3rd UN World Water Development Report. 2009 at vii.

85  Thomasson, Emma. "Slowdown weighs on bottled water." *The Calgary Herald.* November 3, 2008.

86  Mulier, Tom. "Nestlé Waters 'Optimistic' Sales Will Rebound on Emerging Markets Growth." *Bloomberg.* June 21, 2010.

87  Mulier, Tom. "Nestlé Waters 'Optimistic' Sales Will Rebound on Emerging Markets Growth." *Bloomberg.* June 21, 2010. Thomasson, Emma. "Slowdown weighs on bottled water." *The Calgary Herald.* November 3, 2008.

88  Nestlé Waters. [website] Brands by countries. Available at http://www.nestle-waters.com/brands/all-countries.html. Accessed on March 15, 2010.

89  FWW calculation based on data from Nestlé. Annual Report 2009 at 29; Nestlé. Annual Report. 2010 at 39.

90  Nestlé. [Press release]. "Excellent first half for Nestlé in 2008: 8.9% organic growth, 3.5% real internal growth – EBIT margin in constant currencies +60 basis points, +30 basis points reported." August 7, 2008.

91  Thomasson, Emma. "Slowdown weighs on bottled water." *The Calgary Herald.* November 3, 2008.

92  Nestlé Waters. [Brochure]. "Nestlé Waters 2010: 2009 facts and figures." 2010.

93  Nestlé. Annual Report. 2010 at 39.

94  FWW Calculation based on data from Nestlé. Annual Report. 2010 at 39 and Nestlé. Annual Report. 2009 at 29.

95  Nestlé. Annual Report. 2010 at 39.

96  De Lafuente, Della. "Nestlé pitches Pure Life to U.S. Hispanics." *Brandweek.* August 6, 2008.

97  Fernandez, Maria. "Fairwell for El Show de Cristina." *Los Angeles Times.* November 1, 2010.

98  Beverage Marketing Corporation. "Bottled Water in the U.S." 2010 Edition. July 2010 at 166, 167; Lafuente, Della. "Nestlé pitches Pure Life to U.S. Hispanics." *Brandweek.* August 6, 2008.

99  New York City Department of City Planning Population Division. "Socioeconomic Profile Social Characteristics – New York City 1990 and 2000 Census." Data from U.S. Census Bureau, 2000; New York City 2009 Drinking Water Supply and Quality Report." 2009 at 3.

100 "Nestlé to make a splash." *The Financial Times.* July 1, 2010.

101 United Nations Educational Scientific and Cultural Organization and Bergham Books. "Water: A Shared Responsibility." The United Nations World Water Development Report 2. 2006 at i.

102 Jeffery, Kim. [Powerpoint] "The Future of Bottled Water." September 18, 2009.

Food & Water Watch 





**Food & Water Watch**
*Main Office*
1616 P St. NW, Suite 300
Washington, DC 20036
tel: (202) 683-2500
fax: (202) 683-2501
info@fwwatch.org
www.foodandwaterwatch.org

*California Office*
25 Stillman Street, Suite 200
San Francisco, CA 94107
tel: (415) 293-9900
fax: (415) 293-9941
info-ca@fwwatch.org



EXHIBIT C

# COHEN & MALAD, LLP

### ATTORNEYS

One Indiana Square
Suite 1400
Indianapolis, IN 46204
Phone 317-636-6481

cohenandmalad.com

# Directory

Introduction ................................................................................................ 2

Antitrust Cases ............................................................................................3

Securities Fraud Cases.................................................................................3

Consumer Protection Cases.........................................................................4

Human Rights Cases ................................................................................... 8

Health Care/Insurance Cases .....................................................................9

Other Class Action Cases..........................................................................10

Attorney Biographies ................................................................................11

## Introduction

Cohen & Malad, LLP is a litigation firm founded in 1968 in part by former Indiana Attorney General John J. Dillon, former U.S. Attorney for the Southern District of Indiana Virginia Dill McCarty, and Louis F. Cohen. Our staff of over 20 highly skilled attorneys serves clients across multiple practice areas including: class action, personal injury, business litigation, family law, appellate law, and commercial, real estate, and business services.

Cohen & Malad, LLP enjoys an excellent reputation as one of Indiana's leading class action law firms. Over the last 25 years, the firm has served as class counsel in numerous state, national, and international cases.

The firm has successfully litigated a wide range of matters, from representing aggrieved plaintiffs in regional consumer fraud actions, to serving on the executive committees in multi-district and international litigation, including *In re Holocaust Victim Assets Litigation, In re Bridgestone/Firestone, Inc., ATX, ATX II and Wilderness Tires Products Liability Litigation, In re Guidant Corp. Implantable Defibrillators Products Liability Litigation, In re Ready-Mixed Concrete Antitrust Litigation,* and *In re Iowa Ready-Mix Concrete Antitrust Litigation.*

Cohen & Malad, LLP possesses extensive resources, in part through its established relationships with many of the country's leading class action law firms, to vigorously prosecute class action cases of any scale.

2

## Antitrust Cases

- *In re Bromine Antitrust Litigation*, U.S. District Court, Southern District of Indiana.
  Liaison Counsel for the class in price-fixing issue. Settlement valued at $9.175 million.

- *In re Ready-Mixed Concrete Antitrust Litigation*, U.S. District Court, Southern District of Indiana.
  Co-Lead Counsel in a consolidated class action alleging a price-fixing conspiracy among all of the major Ready-Mixed Concrete suppliers in the Indianapolis area. The total settlements provided for a recovery of $59 million, which allowed for a net distribution to class members of approximately 100% of their actual damages.

- *In re Iowa Ready-Mix Concrete Antitrust Litigation*, U.S. District Court, District of Iowa.
  Co-lead counsel in class action alleging a price-fixing conspiracy among major suppliers of Ready-Mixed Concrete in northwest Iowa and the surrounding states. Settlement totaled $18.5 million, which allowed for a net distribution to class members of approximately 100% of their actual damages.

## Securities Fraud Cases

- *Grant et al. v. Arthur Andersen et al.*, Maricopa County Arizona, Superior Court.
  Lead counsel in class action arising from the collapse of the Baptist Foundation of Arizona, involving losses of approximately $560,000,000.00. Settlement achieved for $237 million.

- *In re: Brightpoint Securities Litigation*, U.S. District Court, Southern District of Indiana.
  Class Counsel in securities fraud action that resulted in a $5.25 million settlement for shareholders.

- *City of Austin Police Retirement System v. ITT Educational Services, Inc., et al*, U.S. District Court, Southern District of Indiana.
  Co-lead counsel in action alleging misrepresentations by defendant and certain principals concerning enrollment and graduate placement, and a failure to disclose multiple federal investigations into defendant's operations and records.

3

- *Beeson and Gregory v. PBC et al.,* U.S. District Court, Southern District of Indiana.
  Class Counsel in a nationwide class action with ancillary proceedings in the District of Connecticut, and the Southern District of Florida. Multi-million dollar settlement that returned 100% of losses to investors.

- *In re: Prudential Energy Income Securities Litigation,* U.S. District Court, Eastern District of Louisiana.
  Counsel for objectors opposing a $37 million class action settlement. Objection successfully led to an improved $120 million settlement for 130,000 class members.

- *In re: PSI Merger Shareholder Litigation,* U.S. District Court, Southern District of Indiana.
  Obtained an injunction to require proper disclosure to shareholders in merger of Public Service Indiana Energy, Inc. and Cincinnati Gas & Electric.

- *Dudley v. Ski World, Inc.,* U.S. District Court, Southern District of Indiana.
  Class counsel for over 5,000 investors in Ski World stock. Multi-million dollar settlement.

- *Stein v. Marshall,* U.S. District Court, District of Arizona.
  Class Counsel Committee member in action involving the initial public offering of Residential Resources, Inc. Nationwide settlement achieved on behalf of investors.

- *Dominijanni v. Omni Capital Group, Ltd. et al.,* U.S. District Court, Southern District of Florida.
  Co-lead counsel in securities fraud class action. Nationwide settlement on behalf of investors.

## Consumer Protection Cases

- *Sam v. Elizabeth L. White, in her capacity as Clerk of the Marion Circuit Court,* Marion County Indiana, Superior Court.
  Action involving overcharges for administrative fees on bonds managed by the Clerk's office. Achieved settlement providing refunds of up to $1,000 for individual class members

4

- *Means v. River Valley Financial Bank, et al.,* Marion County Indiana, Superior Court.
  Action involving prepaid burial goods and services in Madison, Indiana. Cemetery owners and banks who served as the trustees for the prepaid burial funds violated the Indiana Pre-Need Act and other legal duties, which resulted in insufficient funds to provide class members' burial goods and services at death. Settlements valued at $4 million were achieved to ensure that thousands of class members' final wishes will be honored.

- *Meadows v. Sandpoint Capital, LLC,* Marion County Indiana, Circuit Court.
  Class action brought against internet-based payday lender. Settlement provided reimbursement for fees and expenses that exceeded amounts permitted by the Indiana payday loan act.

- *King v. Amacor,* Madison County Indiana, Circuit Court.
  Class counsel on behalf of thousands of residents who were forced to evacuate their homes as a result of a magnesium fire that broke out in 2005 at the AMACOR magnesium recycling plant, the world's largest magnesium recycling facility. Settlement achieved to provide environmental remediation clean-up of the debris and direct cash payment to residents who were forced to evacuate their homes on the night of the fire.

- *Colon v. Trinity Homes, LLC and Beazer Homes Investment Corp,* Hamilton County Indiana, Superior Court.
  Class counsel in statewide settlement providing for remediation of mold and moisture problems in over 2,000 homes. Settlement valued at over $30 million.

- *Whiteman v. Time Warner Entertainment Company, L.P.,* Marion County, Indiana, Superior Court.
  Successfully appealed to the Indiana Supreme Court challenging the application of the voluntary payment doctrine for class of cable subscribers. Following this victory, Cohen & Malad, LLP negotiated a multi-million dollar settlement for class members.

- *Hecht v. Comcast of Indianapolis,* Marion County Indiana, Circuit Court.
  Represented a class of Comcast cable subscribers challenging arbitrarily-determined late fees as unlawful liquidated damages. Obtained a multi-million dollar settlement on the eve of trial.

5

- *General Repair Servs. of Central Ind., Inc. v. Soff-Cut Int'l, Inc.,* Marion County Indiana, Superior Court.
  Served as class counsel for a nationwide class under the federal Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. Following certification, the parties entered into nationwide settlement providing class members with benefits worth over $1.5 million.

- *Turner v. Louisiana Pacific Corporation and C.P. Morgan Communities, LP,* Hamilton County, Indiana Superior Court.
  Appointed Lead Counsel in state-wide class action challenging defective exterior siding products. After class certification, parties reached settlement that provided for cash payments to homeowners based on amount of siding and damage to homes.

- *Littell et al. v. Tele-Communications, Inc. (AT&T) et al.,* Morgan County, Indiana, Superior Court.
  Lead counsel in nationwide class action challenging late fee charges imposed by cable television companies. The total value of the nationwide settlement exceeded $106 million.

- *Bridgestone/Firestone, Inc., ATX, ATX II and Wilderness Tires Products Liability Litigation,* U.S. District Court, Southern District of Indiana.
  Court-appointed Liaison Counsel and Executive Committee Member in consolidated litigation involving international distribution of defective tires.

- *Tuck v. Whirlpool et al.,* Marion County, Indiana, Circuit Court.
  Appointed Class Counsel in nationwide class action regarding defective microwave hoods. Settlement achieved in excess of $7 million.

- *Hackbarth et al. v. Carnival Cruise Lines,* Circuit Court of Dade County, Florida.
  Class Counsel in nationwide action challenging cruise lines' billing practices. Settlement valued at approximately $20 million.

- *Sherwood v. Coca-Cola Bottling,* Marion County, Indiana, Superior Court.
  Class Counsel in contaminated product class action. Settlement achieved on behalf of the class.

6

- *David Campbell v. Macey & Chern,* U.S. District Court, Southern District of Indiana.
  Class Counsel in action challenging improper billing and collection of attorneys' fees from Chapter 7 bankruptcy debtors. Common fund settlement provided for refunds in the hundreds of dollars to individual bankruptcy debtors.

- *Wittry v. Merrill Lynch Credit Corp.,* Case No. 49D05-0304-PL-000716, Marion County, Indiana, Superior Court.
  Counsel for class in action challenging documentation fees charged in connection with mortgages closed in Indiana. Settlement achieved through direct payments to class members.

- *Kamala M. Thomason v. Aman Collection Services, Inc.,* U.S. District Court, Northern District of Indiana.
  Class Counsel in a case involving the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* Monetary settlement along with an injunction against illegal practice, and *cy pres* award to Legal Services Organization of Indiana.

- *Baker v. Hubler Ford Center, Inc. d/b/a Hubler Ford Lincoln Mercury,* Shelby County, Indiana, Circuit Court.
  Appointed Class Counsel in case alleging forgery, fraud, constructive fraud and Consumer Protection Act violations by car dealership in connection with the sale and lease of automobiles. Settlement provided each class member with $5,000 to $8,000 in benefits.

- *Kenro, Inc. v. APO Health, Inc.,* Marion County Indiana, Superior Court.
  Appointed Class Counsel in case alleging violations of the Federal Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. Settlement negotiated to create a common fund of $4.5 million and provide benefits to class members of up to $500 for each unsolicited fax advertisement received.

- *James H. Young v. Core Funding Group, LLC,* Marion County Indiana, Superior Court.
  Appointed Class Counsel in case alleging violations of the Federal Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. Successfully defended class certification and $250,000 judgment on appeal.

7

- *Shilesh Chaturvedi v. JTH Tax, Inc. d/b/a Liberty Tax Service,* Court of Common Pleas, Allegheny County, Pennsylvania.
  Class Counsel in case involving Federal Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. Settlement valued at $45 million.

- *Kenro, Inc. and Gold Seal Termite and Pest Control Company v. PrimeTV, LLC, and DirecTV, Inc.,* Marion County Indiana, Superior Court.
  Class Counsel in case involving the federal Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. Following certification, the parties entered into nationwide settlement providing class members with benefits worth in excess of $500 million.

- *JRA Corporation, d/b/a A & A Tire & Service v. Yellow Page Publishers, Inc. d/b/a Smart Pages,* Marion County Indiana, Superior Court.
  Appointed Class Counsel under Ind. Trial Rule 23(B)(1) and (B)(2) in action alleging breach of contract, unjust enrichment and fraud for defendant's failure to fully distribute "yellow page" directories.

**Human Rights Cases**

- *In re Holocaust Victim Assets Litigation,* U.S. District Court, Eastern District of New York.
  Selected as one of ten firms from the U.S. to serve on the Executive Committee in the prosecution of a world-wide class action against three major Swiss banks to recover assets from the Nazi era. This litigation resulted in a $1.25 billion settlement in favor of Holocaust survivors.

- *Kor v. Bayer AG,* U.S. District Court, Southern District of Indiana.
  Action against an international pharmaceutical company for participating in medical experiments on concentration camp inmates during World War II. This action was resolved as part of a $5 billion settlement negotiated under the auspices of the governments of the U.S. and Germany and led to the creation of the *Foundation for Remembrance, Responsibility and the Future.*

- *Vogel v. Degussa AG,* U.S. District Court, District of New Jersey.
  Action against a German industrial enterprise for enslaving concentration camp inmates during World War II for commercial benefit. This action also was resolved in connection with the settlement which created the *Foundation for Remembrance, Responsibility and the Future.*

8

- Cohen & Malad, LLP also actively participated in other cases litigated in federal and state courts in New Jersey, New York and California involving, *inter alia*, slave and forced labor, and claims against major German corporations and financial institutions based upon their wrongdoing during the Nazi era, which were resolved through the *Foundation*.

## Health Care / Insurance Cases

- *In re Indiana Construction Industry Trust*, Marion County, Indiana, Circuit Court.
  Lead Counsel in action against an insolvent health benefits provider from Indiana and surrounding states. Recovered approximately $24 million for enrollees, providing nearly 100% recovery to victims.

- *Davis v. National Foundation Life Insurance Co.*, Jay County, Indiana, Circuit Court.
  Class Counsel in action involving insureds who were denied health insurance benefits as a result of National Foundations' inclusion and enforcement of pre-existing condition exclusionary riders in violation of Indiana law. Settlement provided over 85% recovery of the wrongfully denied benefits.

- *Griffin v. Indiana Comprehensive Health Insurance Assn.*, Marion County, Indiana, Superior Court.
  Class Counsel in action that obtained a rollback on artificially inflated health insurance premiums for high-risk consumers.

- *Lawson v. American Community Mutual Insurance Co.*, U.S. District Court, Southern District of Indiana.
  Class counsel in action challenging denial of claims for diabetes-related health care service and supplies. Settlement achieved on behalf of the class.

- *James C. Sell et al. v. CIGNA Corp. et al.*, U.S. District Court, District of Arizona.
  Co-lead counsel in action challenging non-disclosure of discounts on healthcare charges which forced insureds to pay excessive co-payments. Settlement achieved on behalf of the class.

9

- *Woolbert v. Sandoz Pharmaceuticals, Inc.*
  Class Counsel in action alleging defendant unlawfully tied prescription drug issuance to a costly and unnecessary blood test. Settlement in conjunction with action brought by attorneys general.

- *Follett v. Freedom Life Insurance Company*, Vigo County, Indiana, Superior Court.
  Statewide class action challenging denial of health insurance benefits based on pre-existing exclusions. Settlement provided for over 85% recovery of the wrongfully denied benefits.

**Other Class Action Cases**

- *Roquil, Inc. v. The Indiana State Lottery Commission et al.*, U.S. District Court, Southern District of Indiana.
  Class Counsel in a case where the State Lottery Commission was permanently enjoined from arranging secret, one-sided lottery game incentives. Action resulted in amendment of the Commission's administrative rules.

- *Stephens v. American Cyanamid Company*, Parke County, Indiana, Circuit Court.
  Lead Counsel in multi-state class action involving thousands of farmers who suffered losses as a result of a herbicide. Case settled following Indiana Court of Appeals decision upholding class certification.

- *In re: The Chubb Corporation Drought Litigation*, U.S. District Court, Southern District of Ohio.
  Liaison counsel on behalf of thousands of farmers throughout the Midwest. Settlement of over $40 million.

- *Beacon Development, Inc. v. City of Indianapolis*, Marion County Superior Court.
  Class Counsel in action on behalf of local developers who were wrongly charged for the installation of sewer facilities. Settlement allowed the class to recover 100% of damages.

## Attorney Biographies

**IRWIN B. LEVIN** (Managing Partner), born Indianapolis, Indiana, September 19, 1953; admitted to bar, 1978, Indiana. **Education:** Indiana University—Purdue University at Indianapolis (B.A., 1974); Indiana University (J.D., 1978). Marion County Circuit Court Commissioner, 1978. Judge Pro Tempore, Marion County Circuit Court, 1979. Chairman, Indiana Continuing Legal Education Forum, Class Action Seminar, 1995. Recipient, Hoosier Freedom Award; 2002 Recipient, Distinguished Alumni Award, Indiana University School of Law. **Member:** Indianapolis, Indiana State, Federal and Seventh Circuit Bar Associations; Indiana Trial Lawyers Association (Member, Securities Litigation Committee); The Association of Trial Lawyers of America; Public Investors Arbitration Bar Association. **Reported Cases:** *Time Warner Entertainment Co., LP v. Whiteman*, 802 N.E.2d 886 (Ind. 2004); *Core Funding Group, LLC v. Young*, 792 N.E. 2d, (Ind.App., 2003); *Associated Medical Networks, Ltd. v. Lewis*, 785 N.E. 2d 230, (Ind.App., 2003); *In re: Holocaust Victim Assets Litigation*, 105 F.Supp. 2d 139 (E.D.N.Y. 2000); *In re: Bridgestone/Firestone, Inc.*, 128 F.Supp. 2d 1198; *Shelton v. Wick*, 715 N.E.2d 890 (Ind. App.1999); *American Cyanamid v. Stephen*, 623 N.E.2d 1065 (Ind. App. 1993); *Burger-Fischer v. DeGussa Ag.*, 65 F. Supp. 2d 248 (D.N.J. 1999); *Stransky v. Cummins Engine Co., Inc.* (Fed. Sec. L. Rep., P.98.668), 51 F 1329, 63 USLW 2656 (C.A.7 1995); *Gregory v. Home Insurance Co.*, 876 F.2d 602, Rico Bus. Disp. Guide 7 (C.A.7 1989); *In re: Austrian, German Holocaust Litigation*, 2001 WL 521 464 (C.A.2 N.Y., 2001); *In re: Nazi Era Cases Against German Defendants Litigation*, 198 F.R.D. 429 (D.N.J.

2000); *Winter v. Assicurazioni*, 2000 WL 1858482 (S.D.N.Y. 2000). **Practice Areas:** Class Action Litigation; Commercial Litigation; Securities Litigation; Insurance Law; Personal Injury Litigation; International Law.

A graduate of Indiana University School of Law, Irwin has practiced law with Cohen & Malad, LLP in Indianapolis, Indiana for the past 25 years. While his practice is concentrated in the areas of commercial litigation and class actions, Irwin was one of the lead counsel in the Indianapolis Ramada Inn/U.S. Air Force crash and the Greenwood air crash disaster, among other prominent cases. He has been counsel in class actions involving securities fraud, insurance and consumer protection throughout the U.S.

In 1996, Irwin became active in the first class action case to be filed against Swiss Banks in the U.S. He and other lawyers from Cohen & Malad, LLP took a hands-on role in both the factual investigation of archived materials stored in the U.S. National Archives as well as the legal work before the Court. In 1997, the Swiss Bank litigation was consolidated before a U.S. District Court Judge, who appointed an Executive Committee composed of 10 lawyers from around the U.S. to manage the litigation. Irwin was one of those ten lawyers. As a member of the Executive Committee, he continued to play a significant role in the litigation, researching many of the unusual legal issues presented by this unique litigation and preparing briefs submitted to the Court. Irwin also played a significant role in the lengthy negotiations that culminated in $1.25 billion

11

settlement. Through his expertise in class action litigation, and the settlement of such complex cases, he also has been able to provide valuable insights into the unprecedented task of notifying Holocaust survivors around the world of this historic settlement.

Irwin was active in numerous other Holocaust-related cases against German banks and corporations that stole the assets and labor of Holocaust victims. Cases against German banks seek to recover the assets of Holocaust victims that were confiscated under the Nazis; cases pending against leading German industrial enterprises -- many of which are household names today – seek to recover the value of the slave labor which those companies extracted from the bodies of concentration camp inmates. In addition to these cases, Mr. Levin also served on the Executive Committee in the Bridgestone/Firestone Products Liability litigation.

**DAVID J. CUTSHAW**, born South Bend, Indiana, August 20, 1956; admitted to bar, 1982, Indiana and U.S. District Court, Southern and Northern Districts of Indiana; U.S. Court of Appeals, Seventh Circuit. **Education:** University of Indianapolis (B.A., 1978); Indiana University (J.D., 1982). Phi Delta Phi. Consultant/Contributing Author: Indiana Civil Trial Guide, Mathew Bender, July 1, 1992. **Member:** Indianapolis and Indiana State Bar Associations; Seventh Circuit Bar Association; Indiana Trial Lawyers Association. **Reported Cases:** *Stransky v. Cummins Engine Co., Inc.*, 51 F3d 1329 (7th Cir. 1995); *Dudley v. Ski World*, Par. 94,383 84 Fed.Sec.L.Rep. (CCH S.D. Ind. 1989); *Gregory v. Home Ins. Co.*, 876 F.2d. 602 (7th Cir. 1989); *Morey v. Bravo Productions, Inc.*, Par. 93,554 Fed.Sec.L.Rep. (cch)

(S.D.N.Y. 1987); *Collins v. Covenant Mutual Ins. Co.*, 644 N.E.2d 116 (Ind. 1994); *American Cyanamid Co. v. Stephen*, 623 N.E.2d 1065 (Ind. App. 1993); *Boydston v. Chrysler Credit Corp.*, 511 N.E. 2d 318 (Ind. App. 1987); *Kiracofe v. Reid Memorial Hospital*, 461 N.E.2d 1134 (Ind. App. 1984). **Practice Areas:** Medical Malpractice; Personal Injury Law; Class Action Litigation; Securities Litigation; Aircraft Litigation.

Mr. Cutshaw has acted as co-class counsel in several federal and state securities fraud actions including *Beeson v. PBC* , *Dudley v. Ski World* , *Szapakowski v. Sterling Foster* , and *Stransky v. Cummins Engine Co* ., 51 F.3d 1329 (7th Cir. 1995). He has also been involved as class counsel or a executive committee member in class actions in other areas of the law. He has acted as plaintiff's counsel in other complex litigation such as the A-7 Ramada Inn crash, and he served as Plaintiff's Liaison Counsel in *In re: Greenwood Air Crash* , a mid-air aircraft collision. Since 1982, he has also practiced medical malpractice litigation, primarily defense.

**RICHARD E. SHEVITZ**, Class Action Practice Group Chairman, born Indianapolis, Indiana, April 29, 1960; admitted to bar, 1985, Indiana and U.S. District Court, Northern and Southern Districts of Indiana; 1988, U.S. Supreme Court. **Education:** Indiana University (B.A., with honors, 1982); Ohio State University (J.D., 1985). Managing Editor, Ohio State University Journal of Alternative Dispute Resolution, 1984-1985. Law Clerk to Honorable Frank J. Otte, U.S. Bankruptcy Court, 1986-1987. **Member:** Indianapolis Bar Association. **Practice Areas:** Class Action

12

Litigation; Securities Litigation; Healthcare; Insurance Coverage; Consumer Law. Richard Shevitz graduated with honors from Indiana University in 1982, and earned his law degree from Ohio State University in 1985, where he served as Managing Editor of the Ohio State Journal of Alternative Dispute Resolution. Following a clerkship with U.S. Bankruptcy Judge Frank J. Otte in Indianapolis, Mr. Shevitz served as Assistant Director of the Legal Affairs Department of the Anti-Defamation League in New York, where he litigated First Amendment cases and civil rights actions at trial and on appeal. In 1988, he represented one of the Plaintiffs before the U.S. Supreme Court in *American Civil Liberties Union et al v. County of Allegheny*, 492 U.S. 573 (1989).

Prior to joining Cohen & Malad, LLP, Richard Shevitz served as Deputy Attorney General in the Office of the Indiana Attorney General, where he represented numerous government agencies in trials in state and federal courts, as well as on appeal. In addition to presenting several oral arguments before both the Indiana Court of Appeals and Indiana Supreme Court, Mr. Shevitz argued repeatedly before the U.S. Court of Appeals for the Seventh Circuit.

Since joining the firm in 1995, Mr. Shevitz has concentrated his practice on class action litigation. His class action practice involves claims for securities fraud, violations of ERISA and consumer protection statutes, as well as human rights claims. Mr. Shevitz was also active in litigation over Holocaust-era claims, such as the international class action litigation against Swiss banks, *In re: Holocaust Victim Assets*, that resulted in a $1.25 billion settlement in favor of Holocaust survivors, an action against an

international pharmaceutical company for participating in medical experiments on concentration camp inmates, *Kor v. Bayer et al*, and other cases against international conglomerates for the use of slave labor during the Nazi era, all of which are being resolved through a $5 billion fund.

**AREND J. ABEL**, born Muncie, Indiana June 17, 1960, admitted to the bar, 1986, Indiana; U.S. District Court for the Northern and Southern Districts of Indiana, 1986; U.S. Court of Appeals for the Seventh Circuit, 1987; U.S. Court of Appeals for the Ninth Circuit, 1990; U.S. Court of Appeals for the Sixth Circuit, 1991; United States Supreme Court, 1993; U.S. District Court for the Central District of Illinois, 1997. **Education:** Ball State University (B.A., Telecommunications, *magna cum laude* 1982); Indiana University School of Law, Bloomington, IN (J.D., *summa cum laude*, 1986). **Memberships:** Indianapolis Bar Association; Indiana State Bar Association; American Bar Association; Indiana Trial Lawyers Association; American Association for Justice. Practice Areas: Class Action Litigation; Governmental and Business Litigation; Appeals; Administrative Law.

Arend has practiced in a variety of law firm and governmental settings since his admission to the bar in 1986. He began his career as a law clerk to U.S. Senior Circuit Judge Jesse Eschbach. Following that experience, he worked for five years conducting complex business litigation for one of the state's largest firms.

In 1993, he joined the senior staff of former Indiana attorney general Pamela Carter as special counsel, with responsibility for the State's Supreme Court practice. In that role, he successfully briefed and argued two

13

cases on the merits before the U.S. Supreme Court and numerous cases before the State Supreme and Appellate Courts.

He returned to the private sector in 1996, and since then, has focused on representing businesses, individuals and governmental entities in complex litigation and appeals. His practice includes working with the firm's class action group on appeals and on briefing complex legal issues at the trial court level.

SCOTT D. GILCHRIST, born Indianapolis, Indiana, October 6, 1966; admitted to bar, 1992, Indiana; 1996, Colorado. **Education:** Indiana University (B.A., Journalism, Political Science, 1989); Indiana University School of Law, Bloomington, IN (J.D., *cum laude*, 1992). Member, Indiana Law Journal, 1990-92. **Memberships:** Indianapolis Bar Association; Indiana State Bar Association; American Bar Association (Litigation Section, 1995–); Association of Trial Lawyers of America. **Practice Areas:** Class Action Litigation; Consumer Protection Litigation; Complex Litigation; Antitrust; Securities Fraud.

Mr. Gilchrist brings a diverse civil and criminal litigation background to his current practice, comprised largely of class actions and complex litigation. Mr. Gilchrist regularly represents individual, corporate and municipal clients in state and federal trial and appellate courts. He has served as counsel in several class actions involving antitrust, consumer protection issues, banking practices, property tax allocation, landowner rights, debtor's rights, securities fraud, telecommunications charges, and product defects. His practice includes actions pending in Indiana and around the country.

Mr. Gilchrist is one of the principal attorneys responsible for prosecuting a class action antitrust case against multiple suppliers of ready-mixed concrete in the Indianapolis area, in which Cohen & Malad, LLP, is Co-Lead Counsel. In recent years he was one of the firm's attorneys responsible for securing a multi-million dollar nationwide settlement with Tele-Communications, Inc. for unlawful consumer charges, as well as similar settlements with Comcast and Time Warner/Brighthouse cable companies on behalf of consumers in central Indiana. Since 1998, he has performed a central role in the litigation of fiber optic trespass class actions in jurisdictions throughout the country, participated in settlement negotiations and related proceedings, and continues to perform services related to the administration and final approval of a nationwide, multi-defendant settlement on behalf of landowners. Mr. Gilchrist was also active in the prosecution of a consolidated multi-jurisdiction action against AT&T and Sprint Communications to recover hundreds of millions of dollars in alleged unlawful charges imposed as "universal service fees." That case was certified as a national class action on behalf hundreds of thousands of business customers of AT&T and Sprint, resulting in a multi-million dollar settlement with Sprint and a jury trial against AT&T.

Mr. Gilchrist has represented the City of Indianapolis and the Marion County Sheriff's Department in a proposed class action on behalf of municipalities throughout Indiana against Ford Motor Company to remedy an alleged dangerous defect in the fuel system of Crown Victoria Police Interceptors. He was one of the firm's attorneys responsible for prosecuting

an action to recover tens of millions of dollars in investor funds from Union Planters Bank that were alleged to have been wrongfully accepted for deposit. The funds, usually comprising the life savings or retirement accounts of Indiana citizens, were deposited into a slush fund at the center of a massive "Ponzi" scheme. Mr. Gilchrist obtained a class settlement on behalf of customers of a central Indiana car dealership who were the victims of forgery, recovering payments of several thousand dollars for each class member. He was also responsible for prosecuting a proposed class action on behalf of hundreds of businesses against a major commercial real estate developer for the alleged fraudulent collection of property taxes that were never paid to any taxing authority. In addition, Mr. Gilchrist has been active in the litigation of several class actions under the Telephone Consumer Protection Act, and regularly assists in the firm's representation of plaintiffs and plaintiff classes in consumer fraud, antitrust and securities fraud cases.

**VESS A. MILLER,** born Garrett, Indiana, July 3, 1981; admitted to bar 2006, Indiana; 2011 California. **Education:** Indiana University (B.S., Computer Science, 2003); Indiana University School of Law, Bloomington (J.D., *cum laude*, 2006), Articles Editor, *Indiana Law Journal.* **Member:** Indiana, Indianapolis and American Bar Associations. **Practice Areas:** Class Action Litigation; Complex Litigation; Consumer Protection; Healthcare; Antitrust; Securities Fraud.

**GABRIEL A. HAWKINS,** born Litchfield, Illinois, August 25, 1975; admitted to the bar 2002, Indiana; U.S. District Court for the Southern District of Indiana, 2006; U.S. Court of Appeals for the Seventh Circuit,

2006; U.S. District Court for the Northern District of Indiana, 2007; U.S. District Court for the Central District of Illinois, 2011. **Education:** Southern Illinois University (B.A. *cum laude* History, 1998); University of Illinois (M.A. History, 2000); Indiana University Maurer School of Law (J.D. *cum laude*, 2002). **Member:** Indiana Bar Association. **Practice Areas:** Class Action Litigation; Business Litigation; Mass Torts; Securities Fraud; Real Estate Disputes

Gabriel began his legal career as a law clerk for the Honorable Paul Mathias of the Indiana Court of Appeals between 2003 and 2005. During his tenure with the Court, Gabriel assisted in drafting numerous appellate opinions and assisted the Court with countless oral arguments. After leaving the Court, Gabriel was an associate with Price Waicukauski & Riley, LLC. During this time, Gabriel served as chief brief writer in the well-publicized class action of *In re 2005 U.S. Grand Prix* as well as in the multi-million dollar contract dispute of *ViaStar Energy LLC v. Motorola, Inc*

**LYNN A. TOOPS,** born Teutopolis, Illinois, December 3, 1980; admitted to bar 2006, Indiana. **Education:** Illinois State University (B.S., *summa cum laude*, Entrepreneurship and Small Business Management, 2003); Indiana University School of Law, Indianapolis (J.D., *summa cum laude*, 2006); Student Note Editor, *Indiana International and Comparative Law Review;* Order of the Barristers, Staton Intramural Moot Court Competition. **Member:** Indiana, Indianapolis and American Bar Associations. **Practice Areas:** Class Action Litigation; Complex Litigation; Consumer Protection; Healthcare.

15



Carol Stream, IL 601

MGN 17 SEP 2012 PM

CT Corporation System North America, Inc.
Registered Agent to Nestlé Waters North America, Inc.
208 S. LaSalle Dr., Suite 814
Chicago, IL 60604

# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THE CHICAGO FAUCET SHOPPE, INC., on behalf of itself and all others similarly situated, | : Civil Action No. |
| Plaintiff, | : |
| v. | : |
| NESTLÉ WATERS NORTH AMERICA INC., | : |
| Defendant. | : |

## **DECLARATION OF ERIC LORD**

I, Eric Lord, make the following Declaration under penalty of perjury:

1.      I have personal knowledge of the facts stated herein, and I am competent to testify if called upon as a witness herein.

2.      I am the Director of Consumer Insights of Nestlé Waters North America Inc. In my capacity as Director of Consumer Insights, I am knowledgeable about the sales records for products sold by Nestlé Waters North America Inc., including Ice Mountain® brand 5-gallon bottled water.

3.      Based on Nestlé Waters North America Inc.'s records reflecting sales of Ice Mountain® brand 5-gallon bottled water, since October 2009, Nestlé Waters North America Inc. had more than $5,000,000 in sales in Illinois.

453335

## CERTIFICATE OF SERVICE

I, Sarah R. Wolff, an attorney, certify that on October 10, 2012, I caused a copy of the foregoing **NOTICE OF REMOVAL OF A CIVIL ACTION** to be sent via overnight mail to the following parties:

> Michael J. Newman
> 5225 Old Orchard Road
> Suite 5
> Skokie, IL 60077
> Michael@minlawoffices.com
>
> And
>
> Irwin B. Levin,
> Richard E. Shevitz
> Lynn A. Toops
> COHEN & MALAD, LLP
> One Indiana Square, Suite 1400
> Indianapolis, IN 46204
> ilevin@cohenandmalad.com
> rshevitz@cohenandmalad.com
> ltoops@cohenandmalad.com

_/s/ Sarah R. Wolff_
Sarah R. Wolff